**LILES CONSTRUCTION COMPANY, Inc.**

v.

**The UNITED STATES.**

No. 97–70.

United States Court of Claims.
Feb. 18, 1972.

528

William D. Coleman, Montgomery, Ala., for plaintiff. Herman H. Hamilton, Jr., Montgomery, Ala., atty. of record for plaintiff. Capell, Howard, Knabe & Cobbs, Montgomery, Ala., of counsel.

Russell W. Koskinen, Washington, D. C., with whom was Asst. Atty. Gen., William D. Ruckelshaus, for defendant.

Before COWEN, Chief Judge, LARAMORE, and DURFEE, Senior Judges, and DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## ON PLAINTIFF'S MOTION AND DE-FENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT

NICHOLS, Judge.

Plaintiff was awarded a prime contract, after competitive bidding, to renovate and repair 800 units of Wherry housing at MacDill Air Force Base in Tampa, Florida. Numerous disputes arose under the contract and were administratively adjudicated on appeals by The Armed Services Board of Contract Appeals; of these, three disputes remain and are brought here for review of the Board decisions under the standards of the Wunderlich Act, 41 U.S.C. §§ 321, 322 (1970). Our jurisdiction rests on 28 U.S.C. § 1491 (1970). We deal with each remaining dispute in turn under headings I, II and III. The original Board appeal numbers were, respectively, 12785, 11919 and 12450, reported at 68–1 BCA ¶ 7067 and 68–2 BCA ¶ 7089.

### I

Part of the renovation work included cleaning, sanding, patching and painting interior drywall surfaces. Joe Payne and Son Painting Contractor (Payne) was selected and approved as subcontractor for this work and some other exterior work not the subject of this appeal. The paint originally specified was known by the Base engineers to be unsuitable for the surfaces involved and was never intended to be applied (a fact unknown to plaintiff or to Payne). Plaintiff, however, was informed that the paint was to be changed as soon as additional funds became available. The change was effected before work began. However, the respecified paint failed to bond and peeled and blistered, precipitating a complete stoppage of painting activity. Some three months later, an alternative two-paint system suggested by another paint manufacturer was adopted. This system consisted of a primer coat (Nalprep) and a finish coat (Nalplex) and new application specifications were issued for the system. However, this paint too, created problems; but they appeared randomly. Some units were accepted upon first application; others exhibited latent discoloration and cracking. Wide ranges of viscosity were encountered within the same day upon application. All parties were diligently seeking solutions to the problems, particularly Payne.

These problems, and Payne's efforts to solve them, substantially reduced Payne's performance rate, measured in multi-unit buildings per week, and resulted in the Contracting Officer's making a threat to remove Payne from the project. Five months after the adoption of the Nalplex system, he ordered Payne to be removed for having "deliberately deviated" from specifications and for being "irresponsible, in default." Plaintiff complied, and another subcontractor finished the painting. The Board findings describe the painting difficulties in detail, unnecessary for us to repeat in view of our disposition of this dispute.

Plaintiff pressed the theory of an express change and sought an equitable adjustment before the ASBCA for the difference in cost to Liles of painting under the contract due to the replacement of Payne with another, substantially more expensive painter. The Board found no substantiation for the charge of Payne's irresponsibility and that Payne's deviation from the specifications was not deliberate. The deviation was due to defects in the paint of which Payne could have had no knowledge. The Board further said (ASBCA No. 12785, 68–1 BCA ¶ 7067, 32,674):

When the contracting officer ordered Liles to relieve Payne for cause, he did so on grounds of deliberate deviation from specifications and irresponsibility. He did not cite the Termination for Default clause as warranting the action or any other clause of the contract vesting him with that power. Nor was a termination effected in fact, since no part of the contract work, or appellant's right to proceed with the contract work, was terminated.

\* \* \* \* \* \*

The Government contends that the [Materials and Workmanship] clause empowered the contracting officer to require the removal of a subcontractor deemed incompetent, careless, or otherwise objectionable. Appellant contends that the clause has no reference to subcontracting entities as distinguished from individual employees. For the reasons stated below, we find it unnecessary to decide the point.

The posture of appellant's claim * * * is one of constructive change emanating from the premise that the contracting officer was empowered by the contract to order the removal of a subcontractor, but that he exercised it improperly in that Payne had not exceeded the maximum 350 square feet per gallon of Nalprep as specified. Thus, there is no material issue between appellant and the Government about the Government's contractual right of removal. On the issue which was joined, rate of Nalprep application, appellant's claim fails upon the proofs. There is no evidence to rebut the contracting officer's determination that the actual spread rate of Nalprep was 626 square feet per gallon. A constructive change, on the grounds urged by appellant, has not been established.

Plaintiff urges that the change was express, not constructive, but we deem this is a matter of semantics not decisive to the result. More to the point, and correctly we believe, plaintiff says the Board misapprehended the nature of the change plaintiff relied on. It was not a matter of the spread rate or of defects in the paint, but of the defendant's changing the subcontractor plaintiff had chosen.

Here we have a written notice to terminate Payne's association with the project with no termination of the work which Payne was originally assigned to do. Plaintiff alleges, and defendant does not deny, that it has taken all necessary procedural steps to preserve its rights under the Disputes clause. The sole issue in this Claim I is whether or not the termination of the subcontractor, resulting in higher cost, is compensable under the Changes clause of the contract. The higher cost is simply the higher price that had to be paid another subcontractor to do the work Payne was not permitted to do. The Board found as a matter of fact that Payne was not irresponsible as a subcontractor or in its performance of the painting function. This concession plaintiff says is not vital to its entitlement under this head or even relevant. The Board, however, did not find either Liles or Payne entitled to recovery as a matter of law.

We believe plaintiff to be correct in its contention that it has consistently assumed the posture of seeking recovery for the *change* ordered by the contracting officer. Plaintiff cites its brief before the Board, opening statements before the Board, a colloquy before the Board and its brief in support of its request for reconsideration by the Board as supportive of its position. After referring to all of these cited sources, it is sufficient to set forth certain excerpts from the opening statements before the Board.

TRANSCRIPT p. 567.

MR. HAMILTON: May it please the Board, Appeal No. 12785 concerns the costs arising out of the termination directed by the contracting officer of Joe Payne and Son, as the painting subcontractor of the prime contractor. *It is the position of the prime contractor that such termination was a change; that it required a change in the prosecution of the work; and that such change is compensable under the terms of the contract.*

MR. ROTH: Compensable as termination costs or change costs?

MR. HAMILTON: *As a change cost.*

(All above emphasis supplied).

\*   \*   \*   \*   \*   \*

TRANSCRIPT p. 579–80.

MR. HAMILTON: It was—justified if the facts before the contract-

ing officer may have justified the contracting officer's act. We don't make an issue of that, but he did make [sic] *the right to require the termination as a change if he* desired to, and *that we are entitled to the costs.* (Emphasis supplied.)

\* \* \* \* \* \*

TRANSCRIPT p. 580.

MR. HAMILTON: We think that under the facts, the Government was wrong in taking the action, but we do not feel that we can make an issue of that. Whatever the Government determined, the contracting officer did so act, *and we say that his action entitles us to compensation as a change.* (Emphasis supplied).

From this and the other cited material, it must be concluded that plaintiff's claim was clearly and unequivocally presented as a claim for an equitable adjustment due to an express or constructive change, ordered as to the identity of the painting subcontractor.

The parties agree that the Contracting Officer had the *power* to order the change; the essence of the dispute is whether he had the contractual *right* to do it without obligating the Government to compensate the contractor for any additional costs incurred because of his action. Appellant did not, as the Board assumed, concede that the Contracting Officer could remove Payne without adjustment if its work was improper, and the Board's findings in that regard are irrelevant as to appellant's entitlement to recover.

Although the record before us does not contain the provisions of the contract, we assume that it contains the Standard Form 23–A, required by procurement regulations to be included in such contracts, in use between 1961 and 1968, which states:

The Contracting Officer may, at any time, by written order, and without notice to the sureties, make changes in the drawings and/or specifications of this contract *if within its general scope.* If such changes cause an increase or decrease in the Contractor's cost of, or time required for, performance of the contract, an equitable adjustment shall be made and the contract modified in writing accordingly. \* \* \* (Emphasis supplied.)

With the experience of seven years of contract administration and litigation of this clause as a guide, it was revised in 1967 to reflect what had become by then the generally accepted interpretation of its terms. See Hiestand, A New Era In Government Construction Contracts, 28 Fed.B.J. 165 (1968); 32 Fed.Reg. 16268 (1967):

(a) The Contracting Officer may, at any time, without notice to the sureties, by written order designated or indicated to be a change order, make any change in the work *within the general scope of the contract,* including but not limited to changes:

\* \* \* \* \* \*

(ii) *in the method or manner of performance of the work;*

\* \* \* \* \* \*

(All above emphasis supplied.)

It should be noted that the revisers found it convenient to include the requirement that the order be designated as a change, presumably to delineate the responsibilities of the parties at the earliest possible time to eliminate possible conflicts over the existence or nonexistence of a change, such as we have here.

The revisers not only retained the general scope language, but also listed several examples which had come to be accepted as changes, though not necessarily in the strictest sense of contract interpretation. The pertinent one is quoted, *supra.* In the instant case, it cannot be denied that there was ordered a substantial change in the method and manner of performance of the painting function. An entire performing entity was ordered to be replaced, an entity which, with the approval of the Contracting Officer, was selected by the contractor initially with the view that

the subcontractor would aid the contractor in meeting the terms of the contract, including the low-bid price. There is no greater interference with the manner and method of performance, short of termination of the work itself, than the ordered replacement of the craftsmen originally chosen to do the work.

■ The Government relied before the Board on the power of the Contracting Officer, under the Materials and Workmanship clause, to remove "any employee [he] deems incompetent, careless, or otherwise objectionable." It no longer does. There appears to be universal agreement among the commentators and authorities that this clause has heretofore been considered to involve individual persons who are not in privity with the Government. *See*, Patton, The Material And Workmanship Clause In Government Construction Contracts, 35 Geo.Wash.L.Rev. 998 (1967), where the author notes that the primary purposes for the Employee Removal Provision was to protect the Government from security risks, thefts and bumbling, while also protecting the contractor from labor strife in the event of a removal. Of substantially more interest, we think, is the complete lack of mention by commentators of subcontractors as being within this class of "employee" affected by the Materials and Workmanship clause. This implied acceptance that subcontractors are not affected by or intended to be included in the control exercised under the clause makes all the more compelling plaintiff's argument that if subcontractors were intended to be included that would have been done expressly.

Plaintiff reminds us that the Government exercises substantial control over the selection of subcontractors through refusing to let a contract to a contractor using undesirable subcontractors or retaining the right to approve subcontracts let under the primary contract. The Government also retains control over the performance of subcontractors through its undeniable right to require the prime contractor to perform according to the specifications. The prime contractor has the right, and the responsibility, to perform the contract work according to the specifications unhampered and unrestricted by the Government. Specifications may require the prime contractor to utilize approved subcontractors, but they may not impede or restrict his selection from among approved subcontractors without compensable relief when the Government elects so to interfere.

While the Contracting Officer may effect a change in subcontractors in other ways more circuitous, he must adhere to the strict terms of the contract. For example, the instant case would have been different if he had partially terminated the painting portion of the contract for default, necessarily resulting in the elimination of Payne from the project. Such action would no doubt have resulted in a dispute whether it was justified. It would have put the Government in a better position to obtain for its complaints proper adjudication and disposition on the merits. A similar suggestion was made in an analogous case, General Dynamics Corp., ASBCA 11928, 70–2 BCA ¶ 8401, where the Board found a compensable change where the Government disapproved a subcontractor in a performance-type contract, noting that the contractor was assuming the risk of failure to perform and when the Contracting Officer refused to approve the suggested subcontractor, "he demanded more than the contract between the parties permitted."

Liles had guaranteed the workmanship of Payne with regard to the application of the Nalprep-Nalplex system, but the Government does not rely on this and the terms of the guarantee are not in evidence. To exercise any rights it may have had under the guarantee the Government would have had to set up a counterclaim which it did not do. Therefore, with respect to this claim, we do not consider the possible effects of such a guarantee.

■ Defendant argues that plaintiff consented to the termination of its

painting *subcontract*. Yet that portion of the contract which involved the painting in issue was never terminated and, indeed, it apparently has been completed by plaintiff's replacement subcontractor under the specifications of the original contract. Assuming for the moment that defendant means that plaintiff consented to the removal of Payne as its painting *subcontractor*, plaintiff's acquiescence in Payne's removal, if true, is entirely consistent with its change theory of recovery under this claim. Pursuant to the standard terms of performance contracts, the contractor is obliged to honor and comply with changes ordered by the Contracting Officer, its remedy being an equitable adjustment for the increased cost of the changed work. The fact remains that plaintiff vigorously and repeatedly objected to the removal of Payne, even to the point of suggesting that the removal would most probably result in greater cost and a further delay. Furthermore, plaintiff's representative expressly informed the Contracting Officer that he would not terminate Payne without a directive from the Government and suggested that the Contracting Officer consult with his legal advisors. (Tr. 165.) In this framework acquiescence is not tantamount to agreement with the action taken, or waiver of compensation for it.

▇ Therefore, we find that the claim of the plaintiff was a claim for an equitable adjustment based upon a change in the method or manner of performance; the Contracting Officer's authority under the Materials and Workmanship clause does not extend to the uncompensated removal of a previously approved subcontractor; the Government's removal of a subcontractor to a performance contract constitutes a compensable change when it has failed to expressly reserve such a right in the contract; and that plaintiff is entitled to recover in quantum proceedings excess costs proximately resulting to it from the Government's express direction to remove the subcontractor from the project.

II

▇ In its second count plaintiff claims compensation on behalf of Payne, on the grounds that the dismissal was unjustifiably ordered when it was not clear what had caused the painting problems, and that the alleged grounds for the removal were insufficient. Though not fully spelled out, the theory we suppose is that unless Payne's performance was defective in some way, its contract rights against Liles were breached by the termination ordered, and the equitable adjustment for the change must not only include the costs mentioned under Claim I, but also the cost of settling with Payne. The Board, in its decision, did not find it necessary to reach the merits of the issue, basing its decision against the claim on the alleged principle that a subcontractor cannot oppose the prime contractor under whom it claims. In so holding, it misapprehended Liles' claim, as we have shown. Plaintiff says that it and Payne are not claiming on inconsistent grounds, that its claim for equitable adjustment due to the change is distinct from Payne's claim for illegal breach of its subcontract and not inconsistent. It appears to us that as between the Government and Liles, the claim can be for an authorized change order, without inconsistency with the theory that, as between Liles and Payne, the claim is for a breach for which Liles must settle.

The claims are so intertwined factually and legally that they might perhaps more properly have been lumped together as a single cause of action. However, plaintiff has opted to present them separately under different theories and the Government does not complain that this procedure has hampered it in any way, particularly since these two claims have been tried together all along the line through the administrative review procedure and in this court.

The Board erred in dismissing this second claim summarily on the bald assumption that the claim is inconsistent with the first claim brought by the prime contractor on its own behalf, and

the somewhat dubious and conclusory legal principle that the subcontractor may not oppose the prime contractor under whom it is claiming. Continental Consolidated Corp., ASBCA Nos. 10376, 10504, 10694, 66–1 BCA ¶ 5694, and cases cited therein, and Southern Constr. Co. v. United States, 364 F.2d 439, 176 Ct.Cl. 1339 (1966), cited in support of this principle, each involved a situation where the contractor understood the specification as the Government did, while the subcontractor did not. Under these conditions, it is clear that the prime contractor in prosecuting his subcontractor's claim was assuming a position contradictory to that previously taken and that the two contractors are truly opposed. In this situation, as in Roth, Wadkins & Wise Constr. Co., ASBCA No. 8280, 1962 BCA ¶ 3611, at p. 18,193 language like:

> But there is another compelling reason why this appeal must be disallowed. The subcontractor, whose misunderstanding occasioned the dispute, was a stranger to the contractual transaction. There was no misunderstanding between the Government and the prime contracting party.

is appropriate and applicable.

However, in this case, there is a wholly different situation. As discussed in Claim I of this opinion, Liles steadfastly resisted the removal of Payne from the project until it was ordered to do so. That plaintiff acquiesced in the directed removal does not imply plaintiff's agreement that the removal was justified. The contractor was merely following the Contracting Officer's directives as the contract terms require him to do. Furthermore, it appears from the record that plaintiff never agreed with the Government's position that Payne was at fault with regard to all the project's paint problems. The claim here is for impermissible termination on the theory of breach of contract. The contractor and his subcontractor are in complete agreement and oppose the Contracting Officer's action united and on the same reading of the contract, namely that he was not empowered by the contract to remove Payne under the Materials and Workmanship clause without exposing the Government to the duty of making the contractor whole.

The Board found that Payne was not irresponsible, having satisfactorily performed 25 other painting jobs at MacDill and having completed still others satisfactorily following its ouster from the one at bar. Its findings show that the deviation from the spread rate was not deliberate. The paint troubles, according to witnesses the Board apparently believed, resulted from defects in the paint, for which Payne was not responsible. The Board quite possibly would have found entitlement on this Part II issue, had it not been for its erroneous theory as to the nature of the prime contractor's claim, and its idea that Payne's claim was in conflict. Defendant no longer relies on this, as we read its brief, but rather switches to the view—not relied on by the Board—that Liles consented to Payne's ouster. We have searched the record and determined that Liles objected to this unwarranted decision even more strenuously and consistently than the Board findings show.

Despite the "spread rate" findings the story the Board recounts in its totality raises a doubt whether, but for legal errors, the Board would not have found entitlement, that is, that the equitable adjustment necessary in view of Claim I herein should also include something for settlement with Payne. The Board refers to litigation between Liles, Payne, and the Miller Act surety, involving the same matters, and pending in the United States District Court for the Middle District of Florida. Since the oral argument the parties here have agreed to let us know that this suit has been settled. We conclude that besides determining quantum in the Claim I dispute, the Board should redetermine entitlement as well as quantum as to this Claim II dispute which rises out of the same change order. It will give the Florida litigation whatever consideration it is entitled to have.

### III

This third claim involves electrical work subcontracted by the prime contractor to Southeastern Electrical Enterprises, Inc. (Southeastern). Some of the buildings involved in this project had already had their hall ceilings lowered a foot below that of the other rooms to create a flow of warm air from the hall to the other rooms. This created a wholly closed cavity between the ceiling and the floor above. Other buildings were now to have their hall ceilings similarly lowered. The dispute involves only the former group. The specifications also called for relocating the hall fixtures so that they were "symmetrically located according to the room layout," and extending the existing wiring to the new fixture location.

The difficulties began when another subcontractor, contemporaneously installing air conditioning ducts in the cavity above the lowered ceiling, encountered the existing wiring fanning out in as many as four or five circuits in semi-rigid sleeving, and high into the ceiling cavity, effectively prohibiting him from running his ducts through the same space. Representatives of plaintiff, Southeastern, the air conditioning subcontractor and the architect-engineer agreed that the wiring would have to be eliminated and replaced in order to facilitate the air ducts. They further agreed that Southeastern would be paid on a time and material basis. Plaintiff, on behalf of its subcontractor, submitted several vouchers, approved by the architect-engineer, to the Contracting Officer, who immediately rejected them on the basis that the relocation and replacement work was required under the contract, citing both drawings and specifications in support of his position.

Plaintiff then wrote its subcontractor that it concurred with the Contracting Officer, but it would process any claim made by Southeastern.

The ASBCA made note of plaintiff's concurrence and found that the specifications adequately warned the contractor that he might encounter complications and that any relocation was anticipated and required by the contract, the specifications and the drawings. The Board concluded by noting that there had been "no representation that the circuits ran flat on the joists or that there would be no interference between the existing circuits * * * and the duct runs," and that "rerouting of the circuitry to make room for the ducts was both implied in the general plan of rehabilitation of the building and expressed in drawing notes and symbols."

Plaintiff argues that the location of the circuitry was unknown, unascertainable upon on-site inspections made, and differed materially from locations and posture normally encountered in such work. It asks the court to find that the requirement to relocate existing wiring to accommodate air ducts was unanticipated and constituted either a change in the manner or method of work, or was the result of a changed condition. It says plaintiff reasonably interpreted the contract documents to imply "normal" existing conditions, an interpretation concurred in by the architect-engineer.

In this case we find that the Board failed to give weight to uncontroverted relevant testimony, resulting in factual determinations not substantially supported, and the ASBCA's interpretation of the contract documents is, as a matter of law, erroneous. Even when the decisive issue is interpretation of the contract itself, the underlying factual determinations made by the Board are entitled to finality if supported by substantial evidence. *See* D & L Constr. Co. v. United States, 402 F.2d 990, 185 Ct.Cl. 736 (1968).

There can be no question of this court's jurisdiction over this controversy under the standards of the Wunderlich Act. In Kaiser Industries Corp. v. United States, 340 F.2d 322, 334, 169 Ct.Cl. 310, 330–331 (1965), this court said:

* * * The fundamental issue is the basic nature of the controversy. When a decision concerning the allowability of an equitable adjustment

turns on the proper interpretation of contract provisions, then what is ultimately involved is a question of law. (Citations omitted.)

Also *see*, J. E. Robertson Co. v. United States, 437 F.2d 1360, 194 Ct.Cl. 289, (1971); Perini Corp. v. United States, 381 F.2d 403, 180 Ct.Cl. 768 (1967). After careful and complete study of the drawings and specifications, we conclude that the documents do not indicate that the electrical subcontractor had to overcome the conditions actually encountered. The ASBCA inferentially concluded likewise when it noted that the plans represented the wiring in outline and did not indicate that the wiring was along the joists. In fact, the plans do not indicate just where the wiring was to be found. Defendant's attorney, in his cross-examination of Loyd E. Dyal, Jr., Southeastern's president, could not find any representation in the drawings of more than three runs from a fixture, yet as many as four or five had been encountered. (Tr. 900–901.) As a basis for a changed conditions claim, drawings and specifications need not misrepresent, withhold, or conceal information. Foster Constr. C. A. and Williams Brothers Co. v. United States, 435 F.2d 873, 193 Ct.Cl. 587 (1970).

The contract drawings and specifications cited by defendant, by the absence of special depiction of the existing wiring, would imply that the previous electrical workmanship was of standard quality except where the contrary was intimated. Admonitions such as "may require rerouting of wiring", which applied to outlets to be removed and not to the fixtures in question, "[c]ircuit continuity shall be maintained," and "contractor is responsible to insure circuit continuity" all referred to the relocation of switches and panels, work which is not the subject of this appeal. These phrases, even if applicable to the work involved, would not, in our view, have been sufficient to warn an experienced electrical contractor that substandard workmanship in the existing wiring was to be expected in a Government building.

The Board had before it testimony from two witnesses that the existing electrical work was poorly done in an unworkmanlike manner and that the contractor did not or should not have expected such conditions. (Tr. 868–71, 875–76, 884–86, 896–900.) As it is uncontroverted, we find it to be true. The question now arises whether or not the contractor, in preparing its bids, was reasonable in expecting the existing work to be neat and not to transverse the space where it knew the ducts were to run. If it was reasonable in this assumption and it had no reason to believe otherwise, then, under familiar principles of contract interpretation, the contract documents should be construed against the drafter. *E. g.*, United Contractors v. United States, 368 F.2d 585, 177 Ct.Cl. 151 (1966); *D & L Constr. Co., supra,* 402 F.2d at 995, 185 Ct.Cl. at 745. In *Perini, supra,* 381 F.2d at 410, 180 Ct.Cl. at 780, this court referred to:

> \* \* \* our consistent holdings that to qualify as a changed condition, the unknown physical condition must be one that could not be reasonably anticipated by the contractor from his study of the contract documents, his inspection of the site, and his general experience, if any, as a contractor in the area. \* \* \*

In determining the contractor's reasonableness, it is proper to take into consideration his extensive experience in producing the service called for under the contract documents. *D & L Constr. Co., supra,* 402 F.2d at 994, 185 Ct.Cl. at 743–744. As a contract bidder, plaintiff's subcontractor was charged with knowledge of the contract specifications. Specification TP–24–02(b) directs that "All work be done in a workmanlike manner and in accordance with best current practice." TP–24–03(c) incorporates by reference the National Electrical Code, NFPA No. 70 (1965) which in § 110–12 directs that "Electrical equipment shall be installed in a neat and workmanlike manner." In the light of these specific admonitions for the current project, the contractor could reason-

ably assume that previous Government work would also require neat and workmanlike installation when the ceilings in question were lowered. Moreover, the cavity above the ceiling was a place where the subcontractor did not expect to work at all, and in that respect the case differs from the usual changed conditions claim, where the contractor knew he had to work in unknown conditions, e. g., by laying foundations underground, as in *Foster, supra.*

Even though there is no actual representation that the previous work was done in a workmanlike manner, drawings, indicating normal wiring schemes wherever shown in the project, have the same effect on the bidder as an express representation that the previous work complies with generally accepted craft practices. *Cf.* Woodcrest Constr. Co. v. United States, 408 F.2d 406, 187 Ct.Cl. 249 (1969), cert. denied, 398 U.S. 958, 90 S.Ct. 2164, 26 L.Ed.2d 542 (1970), where the court held the furnishing of a core boring showing no water had the same effect on the bidders as a representation that there was no water. In *Robertson, supra,* where the major issue was whether the contract documents indicated wrongly the thickness of concrete to be encountered, the court, after holding that it is not necessary that indications in the contract be explicit or specific, concluded that the contract contained "indications sufficient to cause plaintiff reasonably to expect subsurface or latent conditions, which differed materially from those actually encountered." 437 F.2d at 1363, 194 Ct.Cl. at 295.

█ The ASBCA erred in failing to find as fact, based on uncontroverted testimony, that the work encountered was not up to accepted craft standards and that Southeastern would have reasonably expected to find neat work, had it expected to work in the areas at all. We so find. These findings are and were central to the claim presented to the Board. There is sufficient prec-

edent to the effect that where the Board fails to make findings of fact fully supported by the Board record and required by that record, the court may make such findings in order to avoid remanding for the purpose of directing the Board to arrive at the inescapable finding. *Foster, supra;* Vann v. United States, 420 F.2d 968, 981, 190 Ct.Cl. 546, 569 (1970); S. S. Mullen, Inc. v. United States, 389 F.2d 390, 398, 182 Ct.Cl. 1, 17 (1968); Maxwell Dynamometer Co. v. United States, 386 F.2d 855, 870, 181 Ct.Cl. 607, 631 (1967).

The Contracting Officer, in his opinion dated April 7, 1967, states:

> * * *. It is reasonable to assume that where an existing ceiling is removed, air conditioning ducts installed, and a new ceiling installed * * *, that some re-routing of the conduit and circuiting to avoid conflict with the mechanical equipment would be required. The contract made provisions for this work and there is no basis for additional compensation.

The Board opinion of June 20, 1968 states:

> * * * there is no representation that the existing circuits ran flat on the joists or that there would be no interference between the existing circuits or the new circuits and the duct runs. Rerouting of circuitry to make room for the ducts was both implied in the general plan of rehabilitation of the building and expressed in drawing notes and symbols.

Yet the plain language of the contract documents indicates fully an intent not consistent with the opinions expressed by the Contracting Officer and the Board. The plans referred to by the Board as "Reconstruction of hallway ceilings at 7'00" level" refer to the to-be-lowered ceilings and not the already lowered ceilings which are the subject of this appeal. The drawings depicting the location of duct runs referred to

were intended only to show the mechanical situation and, though not in evidence before us, presumably did not purport to show electrical configuration as expressed in the electrical drawings. As mentioned previously, witnesses more expert in the electrical field than members of the court profess to be, testified that no reference had been made in the electrical plans that would indicate the condition encountered above the lowered ceilings.

Nor do the specifications referred to by the Board give any inkling that the contractor was expected to undertake a major rewiring project with respect to the lowered ceilings. TP–24–02(a) directs the contractor to "modify the wiring in the remodeled areas of the existing buildings *as shown on the drawings*." (Emphasis supplied.) TP–24–07 also refers to outlets and directs the contractor to study the plans carefully. Yet nowhere in the specifications titled "ELECTRICAL WORK, INTERIOR," are the ceiling fixtures mentioned except with respect to their symmetrical location. A reasonable inference is that the drafter of the specifications considered the relocation of the ceiling fixtures of little moment and as covered in the drawings. The notes on the drawings refer to "extend" and "relocate" but not "replace". The relocation of the ceiling fixtures was but a small part of the electrical work in the renovation and was not given the great importance the Board supposed. Most of the language cited by the Board was not even intended for the ceiling fixtures. What was intended for the fixtures does not come near to directing replacement of the existing wiring. There was no mention of the air conditioning ducts except that the relocation of the fixtures was not to interfere.

■ While it is incumbent upon the contractor to make an on-site inspection, it is not necessary, as suggested on oral argument, "to poke a hole in the ceiling" to discover latent defects. He is held only to the standard of reasonableness. In Farnsworth & Chambers Co. v. United States, 346 F.2d 577, 580–581, 171 Ct.Cl. 30, 35 (1965), cited with approval in *Vann, supra,* this court stated:

> * * *. The contractual requirement that plaintiff make its own investigation of the site does not obliterate the Changed Conditions clause, nor did this requirement obligate bidders to discover, at their peril, subsurface conditions * * * unavailable to any reasonable preaward inspection.

It is the opinion of this court that the extension of wiring to a new location of a fixture on the same surface does not require doing damage to the ceiling to examine the condition of the wiring above it as it was before the extension, when there was no expectation of working there.

■ The fact that the discovery of the wiring net was made by the air conditioning contractor and not the electrical subcontractor lends additional support to Southeastern's argument that it did not expect to encounter such a condition. And the concurrence of the Government Inspector and the architect-engineer, upon inspection of the situation, that Southeastern should be paid on a time and material basis, while not conclusive, is at least persuasive that the work was outside the contract, according to contemporaneous interpretation. *Maxwell Dynamometer Co., supra,* 386 F.2d at 870, 181 Ct.Cl. at 630.

■ Defendant relies on the letter in the Board findings by Liles to Southeastern, transmitting the Contracting Officer's decision adverse to this claim. Liles says it feels further claims by Southeastern would be unjustified, but will be glad to forward the claim if Southeastern wants it to. This, however, differs from the positions mentioned in the preceding paragraph, in that it was taken after the controversy had arisen. It is only actions and inter-

pretations before the controversy arises, conduct during performance, that are "highly relevant in determining what the parties intended." Dynamics Corp. v. United States, 389 F.2d 424, 430, 182 Ct.Cl. 62, 73 (1968). Moreover, Liles never opposed the claim vis-a-vis the Government.

Therefore, we conclude that the conditions encountered above the ceiling were not revealed by the contract documents, were not such as reasonably should have been anticipated by the bidder even after a careful reading of the drawings and a reasonable on-site inspection, and that, in the absence of a warning otherwise, the drawings implied previous workmanlike craftsmanship, and that Liles should be awarded an equitable adjustment in behalf of its subcontractor, Southeastern, with respect to the changed conditions encountered in the area intended for the air conditioning ducts.

Whether we have before us a change or a changed condition is perhaps academic. If it makes any difference, we believe it is a change, because of the fact that the ceiling cavity was a place where the specifications and drawing did not direct the electrical subcontractor to work at all.

Defendant's motion for summary judgment is denied. Plaintiff's motion for summary judgment is granted as to Claims I and III, and further proceedings are suspended herein pursuant to Rule 167 for a period of ninety days to afford the parties an opportunity to obtain an administrative determination as to the quantum of equitable adjustment to which plaintiff is entitled. As to Claim II, since the Board dismissed it on a legally erroneous ground, the proceedings are likewise suspended here, and the application to the Board may relate to both entitlement and quantum. Further proceedings shall be as provided in Rule 167. Judgment is entered accordingly.