SEA–LAND SERVICE, INC.

v.

The UNITED STATES.

No. 331–72.

United States Court of Claims.

April 20, 1977.

Paul J. McElligott, Washington, D. C., attorney of record for plaintiff. Ragan & Mason, Washington, D. C., of counsel.

Raymond B. Benzinger, Washington, D. C., with whom was Asst. Atty. Gen., Rex E. Lee, Washington, D. C., for defendant.

Before SKELTON, NICHOLS and BENNETT, Judges.

## ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS–MOTION FOR SUMMARY JUDGMENT

SKELTON, Judge.

The plaintiff, Sea-Land Service, Inc. (Sea-Land) a common carrier by water within the Shipping Act, 1916, 46 U.S.C. § 801, *et seq.,* entered into Contract N0008371CA1464 with the Military Sea Transportation Service (now Military Sealift Command (MSC)), of the Department of the Navy, effective July 1, 1970, and extending one year to June 30, 1971, for the transportation of containerized cargo between the United States and various foreign ports. The contract was drafted by the United States and was filed by Sea-Land with the Federal Maritime Commission as a statement of rates, terms, and conditions of the service to be furnished by the plaintiff. The pertinent provisions of the contract were as follows:

\* \* \* \* \* \*

ARTICLE I:1 *DESCRIPTION OF SERVICES*

The Carrier represents that he is a common carrier by water within the meaning of the Shipping Act of 1916, as amended; that he operates or will inaugurate by the date stated in the STATEMENT OF RATES an established berth service on the trade routes for which rates are quoted in the SCHEDULE OF RATES, and that he maintains on such routes regularly scheduled sailings of United States flag vessels. The Carrier further represents that he offers container service on the above designated routes to the public for the carriage of commodities having the general shipping characteristics of those for which service may be performed under this Agreement . . .. The term 'Container Service' as used in this Agreement means the movement of cargo in Carrier or Government-furnished containers and the transportation of Government containers, on regularly scheduled vessel sailings for the general public at duly published rates, terms and conditions. In carrying cargoes for the Government in containers in any of his scheduled vessels as provided in this Agreement, the Carrier shall carry as a common carrier.

ARTICLE I:2 *TERMS OF CONTRACTUAL RELATIONSHIP*

(a) The purpose of this Agreement is to establish the terms under which the Carrier offers to accomplish the transportation in containers of such lawful cargo . . . as may be tendered from time to time by the Government for carriage under the Agreement. When transportation services are ordered under this Agreement, a Shipping Order substantially in the form attached hereto as Appendix A . . . will be issued by the Government. The Government will also prepare all necessary

papers including vessel papers or manifests listing the cargo stowed in containers aboard the vessel and such will be receipted for by the Carrier or his agent. Such papers, including vessel papers or manifests, shall be evidence of ownership and together with the Shipping Order constitute the contract of carriage, and all the terms of this Agreement shall be deemed as incorporated therein as part thereof . . ..

\* \* \* \* \* \*

(e) Nothing in this Agreement shall be construed as restricting competition in any manner or as precluding the Government from obtaining transportation from the Carrier on the routes covered herein under the published tariffs of the Carrier that are available to the public, provided goods to be so carried shall be tendered in accordance with the terms and conditions of those tariffs and for carriage under a standard form of Government Bill of Lading . . ..

### ARTICLE I:3 *COMPENSATION*

Compensation for carriage of goods under this Agreement shall be in accordance with the SCHEDULE OF RATES . . ..

\* \* \* \* \* \*

### ARTICLE I:5 *SCOPE OF SERVICE*

(a) The Carrier shall furnish the following services for which rates are published in the SCHEDULE OF RATES.

(i) BASIC SERVICE: *The Carrier's basic service for which he shall be paid at the basic rates set forth in the SCHED-ULE OF RATES* shall consist of furnishing a clean empty container on a trailer to the Government at his terminal; receiving and handling the stuffed container at his loading terminal; loading and *transporting the container in his vessel*; discharging and handling the container at his receiving terminal; furnishing the container on a trailer; and paying all port charges occurring against the container and its contents except charges measured by the volume, weight or value of the cargo.

(ii) DRAYAGE SERVICE: The Carrier's drayage service for which he will be paid at the drayage rates set forth in the SCHEDULE OF RATES . . ..

(iii) STOP-OFF SERVICE: The Carrier's stop-off service for which he shall be paid at the stop-off rates set forth in the SCHEDULE OF RATES . . ..

(iv) STUFFING SERVICE: The Carrier's stuffing service for which he shall be paid at the stuffing rates set forth in the SCHEDULE OF RATES . . ..

(v) TEMPERATURE RECORDING SERVICE: The Carrier's temperature recording service for which he shall be paid at the temperature recorder rate set forth in the SCHEDULE OF RATES shall consist of furnishing a continuous temperature recording instrument in each refrigerated container when so requested by the Contracting Officer at the time the container is ordered . . ..

(vi) SUPERCARGO TRANSPORTATION SERVICE: The Carrier's supercargo transportation service for which he shall be paid at the supercargo transportation rate set forth in the SCHEDULE OF RATES . . ..

(b) Freight shall be computed for each container and shall consist of the sum of all payments due for each of the above services actually furnished in accordance with the orders of the Contracting Officer as set forth in the Shipping Order.

### ARTICLE I:6 *GENERAL CONDITIONS OF SERVICE*

\* \* \* \* \* \*

[This article contained detailed provisions covering miscellaneous activities such as notice to spot, pick up, and remove containers, the use of trailers for moving containers during stuffing, avoidance of areas unsafe for tractors and trailers, delivery of containers at point of discharge, provision of information regarding each container, notice of impending arrival of the vessel, and maintenance of refrigeration for refrigerated containers.]

\* \* \* \* \* \*

### ARTICLE I:8 *PORT CHARGES*

The Carrier shall pay all port charges, canal tolls and similar charges (properly for

the account of the vessel) including such charges assessed at Government installations.

## ARTICLE I:9 *SCHEDULE OF COST RESPONSIBILITIES*

(a) As a means of facilitating the administration of this Agreement, the parties have agreed that certain specific items of cost anticipated as likely to arise in the performance of their respective duties under Articles I:5, I:6 and I:8 shall be listed, and the cost responsibilities of the parties indicated, in a schedule attached hereto as Appendix B . . . and made a part of this Agreement. *Determinations of responsibility for specific items of cost agreed to by the parties under this Article are to be consistent with the general language of Articles I:5, I:6, and I:8;* provided, however, in the event of conflict, the specific language of Appendix B shall prevail.

(b) *Either party may nominate changes to or additional items of cost and cost responsibility to be incorporated into Appendix B.* Such nominating party shall serve upon the other party a written nomination, *together with a detailed statement of all pertinent facts and appropriate supporting data necessary for a determination of the cost responsibility under Articles I:5, I:6 and I:8.* If the other party agrees in writing to the nomination, such nomination will be incorporated into Appendix B as of the agreed effective date. Failure of the other party to agree to the nomination within a period of thirty (30) days from its receipt, or within a mutually agreeable greater period, shall constitute a dispute concerning a question of fact within the meaning of that term in the Article entitled 'Disputes' in Part III of this Agreement.

\*    \*    \*    \*    \*    \*

## ARTICLE I:19 *SCHEDULE OF RATES*

(a) The SCHEDULE OF RATES is a part of the MSTS Container Agreement. It consists of SECTION I, STATEMENT OF BASIC RATES; SECTION II, STATEMENT OF DRAYAGE RATES; SECTION III, STATEMENT OF MISCELLANEOUS RATES; AND SECTION IV, STATE-

MENT OF RATES FOR CARRIAGE OF GOVERNMENT CONTAINERS.

(b) SECTION I consists of a separate Statement of Basic Rates for each route for which the parties have negotiated rates . . . . .

(c) SECTION II consists of a Statement of Drayage Rates, and the rates stated therein shall apply when the Carrier is ordered to dray a container between his terminal where the container is loaded on or discharged from his ship and another place . . . . .

(d) SECTION III consists of Statement of Stuffing Rates, Stop-off Rates, Demurrage Rates (Charges for Container Detention) and other Miscellaneous Rates.

(e) SECTION IV consists of a Statement of Rates for Carriage of Government-Owned or Leased Containers and the rates, terms and conditions stated therein shall apply to services furnished by the Carrier in connection with containers, other than Carrier-owned containers, which are offered by the Government for shipment.

## ARTICLE I:20 *ADDITIONS AND REVISIONS*

(a) Except during the one year period for which the parties have agreed that rates stated in SECTION I, SECTION II, SECTION III, and SECTION IV shall remain effective, the SCHEDULE OF RATES may be amended by the parties in the following manner. Either party may propose in writing that all or a portion of the SCHEDULE OF RATES be amended. No later than thirty (30) days from receipt of such proposal the parties shall undertake to negotiate such an amendment and, if agreement is not reached within sixty (60) days from the commencement of such negotiations, the Carrier shall have the option of withdrawing that portion of the SCHEDULE OF RATES which is the subject of the dispute, such withdrawal being effective after thirty (30) days notice in writing to the Government and being subject to the requirements of applicable statutes and of rules and regulations of cognizant Government agencies.

\*    \*    \*    \*    \*    \*

Appendix B to Part I, referred to in Article I:9, set forth above, contained the following pertinent matter (with emphasis added):

## APPENDIX B

### SPECIFIC ITEMS OF COST IN CONNECTION WITH PERFORMANCE UNDER ARTICLES I:5, I:6 and I:8 AND AGREED DETERMINATION OF COST RESPONSIBILITY AS BETWEEN THE PARTIES

1. *Responsibility of the Carrier*

The Carrier is responsible for the cost of the following services:

a. Furnishing and maintaining containers and trailers except when trailers are waived or containers or trailers are furnished by the Government

b. Drayage (when ordered) . . . .

c. *Port charges and other expenses applicable to the Carrier's vessel:*

   (1) Pilotage

   (2) Tug hire

   (3) Line handling

   (4) Utilities and other services required by the vessel

   (5) Dues (including harbor and quay dues), fees (including light-house fees) and/or taxes assessed against the vessel

   (6) Dockage (or side wharfage), berthage, sheddage, wharfage (or top wharfage)

   (7) Agency fees

   (8) Canal transit tolls

   (9) Customs

   (10) All charges in connection with vessel entrance and clearance

   (11) Special fire or security watch required as a condition to stay in port

   (12) Terminal service and facilities charges at commercial piers

   (13) *Other costs in connection with operation of the ship*

   \*   \*   \*   \*   \*   \*

[Emphasis supplied.]

The contract also contained the standard disputes clause.

On January 4, 1971, Sea-Land applied to defendant for a temporary bunker fuel surcharge on rates in the contract based on "drastic increase in the cost of bunker fuel on a worldwide basis." The defendant rejected plaintiff's application on January 5, 1971, on the ground that there were no provisions in the contract that authorized a rate increase to cover increases in the cost of bunker fuel.

On January 18, 1971, plaintiff, purporting to act in accordance with Article I:9(b) of the contract, nominated "as a change or additional item of cost and cost responsibility, to be incorporated into Appendix B, a bunker surcharge to cover the bunker fuel price recently imposed by suppliers." The plaintiff also cited the "custom of the trade" to impose bunker surcharges, which had been recognized by the Federal Maritime Commission. The plaintiff justified its action by citing the drastic increases in bunker fuel and an expected further increase in early 1971. The defendant denied plaintiff's nomination on the ground that it was inconsistent with Articles I:5, I:6, and I:8 of the contract. Plaintiff appealed to the Armed Services Board of Contract Appeals (ASBCA or Board). The Board denied plaintiff's appeal on August 4, 1972.[1] The decision of the Board was as follows:

### DECISION

*Meaning of Contract Provisions.* The dispute ultimately concerns the meaning of Article I:9(b) of the "basic terms of agreement," viewed in the context of Article I:9(a), Appendix B, and the other related provisions, such as Articles I:3, I:5(a)(i) and (b), and I:20(a).

■ We are unable to entertain the view advanced by appellant that Article I:9(b) provides a means for escalating freight rates to compensate for the increased cost of bunker fuel as measured by the claimed surcharge or otherwise.

---

1. ASBCA No. 16218, 72–2 BCA ¶ 9605.

Appellant's claim tacitly assumes that the cost items in Appendix B had a dollar value at the outset, and that consequently, when a higher dollar cost is actually experienced for an item present in Appendix B as a carrier responsibility, the increase can be nominated by the carrier as a "change to" or "additional item of cost" under Article I:9(b).

Such is not the case. Appendix B describes costs only by nature, kind, or character without regard to any dollar amount and without any warranty against inclusion of contingency factors in rates. Contrary to appellant's assumption, the contract in truth is cast in terms which provide that the risk of dollar increases in costs of the items of cost assigned to the carrier shall be covered by the stipulated rates. Article I:5(a)(i) makes transportation of the container, along with handling etc., the basic service for which rates are to be paid. Transportation at a given rate is, therefore, central to the principal apparent purpose of the contract; and Article I:3 makes the rates the compensation to be paid. Appendix B1c(13) makes costs in connection with the operation of the vessel (in addition to those expressly mentioned in Appendix B1c(1) through (12)) part of the cost responsibility of the carrier. There is no contention or evidence of the existence of any applicable usage which by implication would exclude the cost of fuel from the cost of operation of the vessel under this type of berth service contract in the absence of an express exclusion, and appellant necessarily concedes that the cost of fuel was not excluded here. Moreover, under Article I:20(a) the rates are intended to continue unchanged for a year.

Thus the entire thrust of the relevant contract provisions, particularly Article I:5(a)(i) and Appendix B1c(13), is to place the risk of increases in bunker fuel costs (and the benefit of any decline) on the carrier. In making a nomination under Article I:9(b) a party is required to demonstrate consistency with Article I:5(a)(i). Nomination of the added dollar cost of fuel is neither the nomination of a change to an existing item nor the nomination of an additional item, is inconsistent with Article I:5(a)(i), and would frustrate the principal apparent purpose of the contract.

*Conclusion.* In our opinion, the contract, interpreted in accordance with the usual canons of interpretation, unambiguously excludes entitlement to recovery, under Article I:9(b) of the "basic terms of agreement," of the increased cost of bunker fuel by surcharge or otherwise. See *Restatement, Contracts (1932)*, see 230, 235, 236(a), (b). Accordingly, the appeal is denied.

Plaintiff filed this suit on August 29, 1972, seeking review and reversal of the decision of the Board under the standards of the Wunderlich Act, 41 U.S.C. §§ 321, 322 (1970). It seeks to recover $2.00 per ton on 4,077,009 tons of transported cargo. The case was heard by a panel of the court which entered an order on May 31, 1974, 204 Ct.Cl. 912, which provided:

\* \* \* [T]he case is remanded to the Armed Services Board of Contract Appeals, under Public Law 92–415 and General Order No. 3 of 1972, to determine whether the drastic increase in the cost of bunker fuel, on which plaintiff predicates this claim, was foreseen by plaintiff when it entered into the contract on July 1, 1970, or was reasonably foreseeable at that time as likely to arise during the contract period;

On remand, the Board issued its opinion on April 30, 1976, holding that the drastic increase in bunker fuel prices was not foreseen by the plaintiff and, by a three to two decision held that such increase was not reasonably foreseeable. The Board did not change its opinion of August 4, 1972, *supra.*

The case is now before us on plaintiff's motion and defendant's cross-motion for summary judgment.

■ Plaintiff contends that the decision of the Board was arbitrary, capricious, and not supported by substantial evidence. We do not agree and conclude that the contrary was true. Plaintiff argues further that we are not bound by the decision of the Board in interpreting the contract since this is a

question of law. We agree that this is a correct statement, but we conclude that the Board correctly interpreted the contract and we approve the interpretation which it made. We find no fault with the decision of the Board and conclude that its decision should be affirmed.

Plaintiff argues that the contract is ambiguous and all doubts should be resolved against the defendant who drafted the contract in accordance with the *contra proferentem* rule. We do not agree that the contract is ambiguous and, consequently, we do not apply the aforesaid rule. *See ITT Arctic Services, Inc. v. United States,* 524 F.2d 680, 207 Ct.Cl. 743 (1975). It should be remembered that the contract is a fixed price contract under which the plaintiff was to furnish specified services for specified payments for a period of one year. There was no provision for escalating the amounts that would be paid to the plaintiff. The plaintiff would engraft an escalation clause on the fixed price contract, which cannot be done in the circumstances of this case. It is unfortunate that the plaintiff got caught by the increase in price of the bunker fuel, but that was a risk it assumed under the terms of the contract. As the Board pointed out, Article I:3 makes the rates the compensation to be paid and Appendix B1c(13) makes costs in connection with the operation of the vessel, which certainly includes bunker fuel, the responsibility of the carrier. Furthermore, under Article I:20 the specified rates were to continue unchanged for the period of one year.

Plaintiff relies on its right to nominate "changes to or additional items of cost and cost responsibility to be incorporated into Appendix B." This article does not mean that plaintiff by simply nominating bunker fuel cost increases, binds the government by such nomination and that this amounts to an escalation clause that increases the rates. Article I:9(b) states that any nomination must comply with Articles I:5, I:6, and I:8. Article I:5 states that the carrier "shall be paid at the basic rates set forth in the schedule of rates." Plaintiff's nomina-

tion does not comply with this article. Article I:6 deals only with general conditions of service and is not particularly relevant here. Article I:8 requires the carrier to pay all port charges.

We agree with the Board that Article I:9(b) does not provide a means for escalating freight rates to compensate for increased cost of bunker fuel. That article states that "either party may nominate changes to or additional items of cost and cost responsibility to be incorporated into Appendix B." As the Board held, the cost items in Appendix B had a dollar value, and when that dollar value increased as to any item that was a carrier responsibility, such increase cannot be nominated by the carrier as a "change to" or "additional item" of cost under Article I:9(b). The Board correctly stated that "Appendix B describes costs only by nature, kind, or character without regard to any dollar amount and without any warranty against inclusion of contingency factors in rates. Contrary to appellant's assumption, the contract in truth is cast in terms which provide that the risk of dollar increases in costs of the items of cost assigned to the carrier shall be covered by the stipulated rates. Article 1:5(a)(i) makes transportation of the container * * * the basic service for which rates are to be paid. * * * Article I:3 makes the rates the compensation to be paid. Appendix B1c(13) makes costs in connection with the operation of the vessel [which includes bunker fuel costs] part of the cost responsibility of the carrier."

We conclude that the contract placed the risk of increases in bunker fuel costs on the plaintiff. When Sea-Land made the nomination under Article I:9(b) it failed to show it was consistent with Article I:5(a)(i). The nomination of the increased cost of fuel was neither the nomination of a *change to an existing item* nor the nomination of *an additional item* and was inconsistent with Article I:5(a)(i). Actually, plaintiff's nomination as to increased fuel costs was an effort on its part to force the defendant to pay a part of the costs of the operation of the

vessel, which was clearly its obligation under the contract.

Plaintiff argues further that the defendant should be required to pay the increased fuel costs because during plaintiff's appeal the government modified follow-on contracts by adding, effective July 1, 1971, an escalation clause to cover fluctuations in costs of bunker fuel. Such change did not affect the contract in issue here, because it terminated on July 1, 1971, which was the date the change became effective. It is well settled that only actions and interpretations which occur before a controversy arises are relevant in determining and interpreting the meaning of a contract. *See Liles Constr. Co. v. United States,* 455 F.2d 527, 197 Ct.Cl. 164 (1972); and *Dynamics Corp. of America v. United States,* 389 F.2d 424, 182 Ct.Cl. 62 (1968).

Plaintiff says that Article I:9 is ambiguous and should be construed against the government. We conclude that it is unambiguous and there is no requirement that it be construed against the government. *See ITT Arctic Services, Inc. v. United States, supra.*

Plaintiff argues further that the "custom of the trade" should have been considered in interpreting the contract. It is well settled that when the terms of a contract are clear and unambiguous, there is no need to resort to the custom of the trade for its interpretation. Furthermore, there was no evidence as to the custom of the trade, except that relating to custom in 1972, and thereafter, after plaintiff's contract had expired and escalation provisions had been inserted in follow-on contracts.

We hold that the Board properly construed the contract provisions and that its decision was not arbitrary nor capricious and was supported by substantial evidence and is entitled to finality and it is hereby affirmed.

Accordingly, plaintiff's motion for summary judgment is denied, the cross-motion for summary judgment of defendant is granted, and plaintiff's petition is dismissed.