**Kenneth J. KNIEPER and Mary L. Knieper, Plaintiffs,**

v.

**UNITED STATES, Defendant.**

**No. 94–376C.**

United States Court of Federal Claims.

May 23, 1997.

Larry D. Harvey, Englewood, CO, attorney of record, for plaintiffs.

Laureen Kapin, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, DC, with whom were James M. Kinsella, David M. Cohen and Frank W. Hunger, Assistant Attorney General, attorneys of record, for defendant.

## OPINION

HORN, Judge.

The above-captioned case comes before the court on the parties' cross-motions for summary judgment, pursuant to Rule 56 of the Rules of the United States Court of Federal Claims (RCFC). The plaintiffs, Kenneth J. Knieper and Mary L. Knieper, allege that the defendant, the United States, acting through the Department of Housing and Urban Development (HUD), committed a breach of contract and a breach of warranty, or, in the alternative, a mutual mistake was committed,[1] due to the absence of a serviceable well on the property purchased by the plaintiffs from the defendant. Plaintiffs argue that they are entitled to damages or, in the case of mutual mistake, the plaintiffs seek to have the contract voided, and to recover the amounts they have expended, plus other damages incurred by the plaintiffs.

Plaintiffs contend, based on documents signed by the parties and included in the record, that the defendant represented that the property purchased by the plaintiffs was serviced by a well located on the premises. In fact, the well on the property did not provide water to the property. Plaintiffs argue, therefore, that the defendant breached the "Sales Contract," dated October 10, 1989, by failing to provide water to the plaintiffs as agreed.

Plaintiffs further contend that the defendant provided a warranty through the Deed that the premises were conveyed with all appurtenances, which they allege included water from the well located on the premises, and that the existence of the warranty was material to the bargain. Because the well on the property did not service the premises, the defendant is alleged to have breached the warranty.

In the alternative, plaintiffs allege that both the plaintiffs and the defendant were unaware that a serviceable well was not located on the property, and that both parties believed that the well shown within the boundaries of the property on the "Improvement Location Certificate" provided water to the premises. Therefore, according to the plaintiffs, the absence of a working well on the premises amounted to a mutual mistake of material fact. Furthermore, plaintiffs state that: "The Defendant has been re-

---

1. In the plaintiffs' complaint, the order of the counts set forth is: Count I—Breach of Contract; Count II—Mutual Mistake; Count III—Breach of Warranty.

stored to the status quo by receiving the property as a result of the foreclosure."

Defendant denies liability and has moved for summary judgment. Defendant asserts that summary judgment is appropriate because there are no material issues of genuine fact in dispute, and that contract interpretation is a question of law. Defendant contends that plaintiffs have failed to come forward with sufficient evidence to prevail on the plaintiffs' breach of contract, breach of warranty, and mutual mistake theories of relief. Furthermore, defendant argues that the conditions of the Sales Contract do not provide any basis for relief, and, in fact, expressly preclude plaintiffs from prevailing in this action because the Sales Contract, through the "Conditions of Sale," contains explicit conditions to the contrary. Defendant also relies on provisions in the "Inspection Addendum" to the Sales Contract, which provided that, if plaintiffs did not cancel the Sales Contract before the expiration of the stated inspection period, they accepted the property and its appurtenances "AS IS," and in the "condition existing" on the date of the Sales Contract.

After careful consideration of the record in the above-captioned case, and, as is discussed more fully below, the court, hereby, **GRANTS** defendant's motion for summary judgment and **DENIES** plaintiffs' cross-motion for summary judgment.

### FACTS

In December 1988, HUD acquired a single family home at 29554 Lee Road, Evergreen, Colorado, under the Federal Housing Administration single family home mortgage insurance program. Plaintiffs entered into a Sales Contract with HUD to purchase the property on October 10, 1989, for the amount of $75,833.00.[2] The record shows that the plaintiffs are experienced home owners and have owned approximately five homes.

In Line 12 of the Sales Contract, entered into on October 10, 1989, for the property at issue, the contract was made subject to certain Conditions of Sale, which are located on the reverse side of the Sales Contract. The relevant provisions of the Conditions of Sale read as follows:

B. Purchaser will accept the property in the condition existing on the date of this contract. Seller does not warrant the condition of the property, including but not limited to mechanical systems and dry basement, or compliance with code requirements and will make no repairs to the property after execution of this contract.

\* \* \* \* \* \*

E. Risk of loss or damage is assumed by Seller until sale is closed, unless Purchaser takes possession of the property prior thereto, in which case state law shall apply. . . .

\* \* \* \* \* \*

G. Purchaser understands that Seller's listing price is Seller's estimate of current fair market value.

\* \* \* \* \* \*

L. The effective date of this contract is the date it is signed by the Seller.

\* \* \* \* \* \*

O. This contract contains the final and entire agreement between Purchaser and Seller and they shall not be bound by any terms, conditions, statements, or representations, oral or written, not contained in this contract.

An Inspection Addendum to the Sales Contract, which was signed on October 6, 1989 by one party and by the other party on October 10, 1989, provided an opportunity for the plaintiffs to inspect the property before closing the sale. Subsequently, the plaintiffs requested, and received, two time extensions to complete an inspection of the septic system by the County Health Department and an engineer. The only problem the plaintiffs identified with respect to the property prior to the closing concerned the septic system, and was resolved satisfactorily prior to closing.

Although the "Inspection Addendum" gave plaintiffs the opportunity to personally in-

---

**2.** In their motion for summary judgment, plaintiffs state: "The purchase price was $75,830.00." The Deed and the Sales Contract, however, both use the number $75,833.00.

spect or to hire an agent to inspect and approve the major operating systems of the property, including plumbing, or any "other aspects and components of the property," no such inspection was performed by the plaintiffs.[3]

The Inspection Addendum to the Sales Contract provided, in its entirety, as follows:

This contract is specifically contingent upon Purchaser's inspection and approval of the major operating systems of the property by Purchaser or Purchaser's representative. Said inspection shall be at Purchaser's expense. Major operating systems shall be defined as the structural, plumbing, electrical, heating and air conditioning (if any) systems and the roof. No representation as to the condition of the property with respect to the major operating systems is made by HUD, its agents, sub-agents or employees unless such representation is disclosed to the Purchaser in writing.

Purchaser may, at Purchaser's option and expense, inspect other aspects and components of the property; however, this inspection contingency pertains to the above described major operating systems only. The appliances (if any) including stove, dishwasher, refrigerator, garbage disposal, clothes washer and clothes dryer are not included in the major operating systems inspection and are accepted by Purchaser in 'AS IS' condition. Purchaser is not entitled to cancel the contract if any of these other aspects or components of the property, including appliances, are found to be unsatisfactory.

The plumbing inspection shall be done using the air test method only. The Purchaser shall not de-winterize the plumbing or turn on the water.

In the event the results of Purchaser's inspection of the major operating systems are not satisfactory to Purchaser and Purchaser notifies HUD or its agent, in writing, of the unsatisfactory inspection no later than 4:30 p.m. on the tenth (10th) calendar day after the date HUD signs this contract, this contract shall be considered null and void and the earnest money deposit shall be returned to Purchaser. In the event the tenth (10th) calendar day after the date HUD signs this contract falls on a weekend or Federal Government holiday, the Purchaser shall have until the next regular business day to notify HUD or its agent of the unsatisfactory inspection. In the absence of any notification of an unsatisfactory inspection within the time period stated above, this contract shall remain in full force and effect.

Regardless of the outcome of the inspection, if the Purchaser does not cancel the contract as indicated above, the Purchaser accepts the property and its appurtenances in "AS IS" condition.

Purchaser agrees to rely only upon those representatives whom Purchaser may engage to conduct the inspection, or upon Purchaser's own inspection. Purchaser may not rely upon any representations of HUD, HUD's agents, sub-agents or employees unless such representations are received in writing. It shall be the sole duty and responsibility of the Purchaser to conduct the inspection or to order the inspection by representatives of Purchaser's choosing.

On December 15, 1989, a land surveying company prepared an Improvement Location Certificate. The survey, as shown on the Certificate, indicated the presence of two wells, one inside the boundaries of the property purchased by the plaintiffs and one just outside the boundaries of the purchased property.

The sale of the property by the defendant to the plaintiffs closed on December 27, 1989. The Deed to the property was recorded in Jefferson County, Colorado, on January 4, 1990. As part of the sale, HUD insured plaintiffs' mortgage and agreed that, in the event of a default, HUD would pay the mortgage company for any losses incurred, in exchange for the mortgage company conveying title to the property back to HUD.

On December 27, 1989, as part of the closing procedures, the parties signed a

3. In response to Interrogatory No. 5 included in the record, and posed by the defendant regarding inspection of the premises, plaintiffs responded:

"None by Plaintiffs. The Plaintiffs are aware of no inspections done by potential buyers either."

"Utility Agreement," which relieved Commonwealth Land Title Insurance Company, the closing agent, of responsibility for outstanding water and/or sewer utility service bills. This document includes a single reference, "WELL AND SEPTIC," on which plaintiffs heavily rely. The Utility Agreement is reproduced in full in order to avoid distortion of the in-context meaning of the words "WELL AND SEPTIC" as they actually appear on the document.

## COMMONWEALTH
### LAND TITLE INSURANCE COMPANY
A Reliance Group Holdings Company

ESCROW NO. U100419-Y

UTILITY AGREEMENT

With regards to the closing of: 29554 LEE ROAD, EVERGREEN, CO 80439 (property address), both the undersigned Buyer(s) and Seller(s) fully understand and agree that the Telephone, Public Service Company and the present Hazard Insurance Agency will not be notified by Commonwealth Land Title Insurance Company. The parties agree to the following:

$ *** IS BEING ESCROWED PENDING FINAL

$ N/A ** OWING FROM _____ TO _____ HAS BEEN COLLECTED/PRORATED AT CLOSING. FOR FLAT RATE WATER AND/OR SEWER.

$ N/A OWING FROM _____ TO _____ HAS BEEN COLLECTED/PRORATED AT CLOSING FOR STORM DRAINAGE IN DENVER COUNTY.

*** WELL AND SEPTIC

IF COMMONWEALTH LAND TITLE INSURANCE COMPANY HAS ESCROWED FUNDS ON A METERED ACCOUNT, COMMONWEALTH LAND TITLE INSURANCE COMPANY WILL PAY ANY FINAL BILL AND REFUND ANY MONIES IN EXCESS OF THE FINAL BILL TO THE APPROPRIATE PARTY. IN THE EVENT THE FINAL BILL EXCEEDS THE ESCROWED AMOUNT, ANY ADDITIONAL CHARGES ARE THE RESPONSIBILITY OF THE APPROPRIATE PARTY, AND COMMONWEALTH LAND TITLE INSURANCE COMPANY SHALL NOT BE RESPONSIBLE FOR THE PAYMENT OF ADDITIONAL CHARGES.

IN THE EVENT OF A FLAT RATE PRORATION, COMMONWEALTH LAND TITLE INSURANCE ASSUMES NO RESPONSIBILITY OR LIABILITY IF THE FIGURES WERE MISQUOTED BY THE UTILITY COMPANY. ANY ADJUSTMENTS SHALL BE MADE BETWEEN THE BUYER(S) AND THE SELLER(S).

DATED THIS 27TH DAY OF DECEMBER , 19 89 .

BUYER KENNETH J. KNIEPER

BUYER MARY L. KNIEPER

SELLER THE SECRETARY OF HOUSING AND URBAN DEVELOPMENT OF WASHINGTON, D.C.

SELLER

BUYER

SELLER

BUYER

SELLER

AS PER THE SECRETARY OF HOUSING AND URBAN DEVELOPMENT, NO FUNDS WILL BE ESCROWED FOR FINAL METERED WATER AND/OR SEWER BILLS. ALL FINAL BILLS WILL BE PAID DIRECTLY BY THE CONTRACT ACCOUNTANT FIRM FOR THE SECRETARY OF HOUSING AND URBAN DEVELOPMENT. IT IS AGREED AND UNDERSTOOD THAT COMMONWEALTH LAND TITLE INSURANCE COMPANY WILL BE HELD HARMLESS IN THE EVENT THAT ANY WATER AND/OR SEWER BILLS REMAIN UNPAID.

7200 E. Hampden Ave., Suite 300, Denver, Colorado 80224 • 303-757-5500

TITLE INSURANCE SINCE 1876

At the time of the closing, water was available for all uses on the property purchased by the plaintiffs. Sometime in January of 1990, after closing, the well froze, and it was discovered that the water supply to the property was not from the on-site well, but was from the well just outside the property boundary. Even after the plaintiffs discover-

ed that the well on their property was not the one providing water to the property, plaintiffs continued to reside at the property for more than a year, before moving to Michigan for employment reasons. Although the record is not clear on this point, during their continued tenure on the property, plaintiffs apparently had a continuing source of water. Plaintiffs claim that they were unaware that the off-site well was providing water to the property at the time of closing, and that they had "no reason to know." Defendant argues that there also is no evidence to indicate that HUD was aware of the off-site source of the property's well water from the time HUD acquired the property through the time that the property was sold to the plaintiffs.

Plaintiffs attempted to sell the property to June Golaz in May of 1991. Ms. Golaz had moved onto the property pursuant to a rental arrangement, and occupied the premises pending closing of the sale between the plaintiffs and Ms. Golaz. The sale of the property to Ms. Golaz failed, however, because no adequate arrangements could be made for the granting of an easement by the owner of the working well.

During April 1991, plaintiffs became delinquent in their loan payments on the property. Plaintiffs received a notice of foreclosure on November 19, 1991, and foreclosure proceedings subsequently took place (Public Trustee's foreclosure No. J–1679). Title was ultimately conveyed back to HUD in February 1992. HUD attempted to sell the property again during the Fall of 1992. Subsequent inspection reported that water to the property was being provided by the well located adjacent to the property. HUD disclosed the well problem in its advertisements for the resale of the property, which stated "NO WELL EASEMENT."[4] The property was subsequently resold.

Although plaintiffs argue that they paid "far in excess of market value and sustained significant damages," defendant argues that,

as a result of plaintiffs' foreclosure, it was the defendant which suffered a financial loss because HUD was forced to pay a mortgage insurance claim to plaintiffs' lender.

### DISCUSSION

■ Summary judgment in this court should be granted only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. RCFC 56 is patterned on Rule 56 of the Federal Rules of Civil Procedure (Fed.R.Civ.P.) and is similar in language and effect.[5] Both rules provide that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

Rule 56(c) provides that in order for a motion for summary judgment to be granted, the moving party bears the burden of demonstrating that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Creppel v. United States*, 41 F.3d 627, 630–31 (Fed.Cir.1994); *Meyers v. Asics Corp.*, 974 F.2d 1304, 1306 (Fed.Cir.1992); *Rust Communications Group Inc. v. United States*, 20 Cl.Ct. 392, 394 (1990); *Lima Surgical Assocs., Inc. Voluntary Employees' Beneficiary Ass'n Plan Trust v. United States*, 20 Cl.Ct. 674, 679 (1990), *aff'd*, 944 F.2d 885 (Fed.Cir.1991). Disputes over facts which are not outcome determinative under the governing law will not preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Summary judgment, however, will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reason-

4. The ad released prior to the sale to the plaintiffs of the property at issue in the above-captioned case was silent on the issue of well access.

5. In general, the rules of this court are patterned on the Federal Rules of Civil Procedure. Therefore, precedent under the Federal Rules of Civil

Procedure is relevant to interpreting the rules of this court, including RCFC 56. *See Jay v. Sec'y DHHS*, 998 F.2d 979, 982 (Fed.Cir.1993); *Imperial Van Lines Int'l Inc. v. United States*, 821 F.2d 634, 637 (Fed.Or.1987); *Lichtefeld–Massaro, Inc. v. United States*, 17 Cl.Ct. 67, 70 (1989).

able jury [trier of fact] could return a verdict for the nonmoving party." *Id.; see also Uniq Computer Corp. v. United States,* 20 Cl.Ct. 222, 228–29 (1990).

When reaching a summary judgment determination, the judge's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 249, 106 S.Ct. at 2511; *see, e.g., Cloutier v. United States,* 19 Cl. Ct. 326, 328 (1990), *aff'd without op.,* 937 F.2d 622 (Fed.Cir.1991). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 250–52, 106 S.Ct. at 2511–12. When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Stated otherwise, if the nonmoving party cannot present the evidence to support its case under any scenario, then there should be no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings.

If, however, the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. *Id.; see also Litton Indus. Prods. Inc. v. Solid State Sys. Corp.,* 755 F.2d 158, 163 (Fed.Cir.1985); *H.F. Allen Orchards v. United States,* 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied,* 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

The initial burden on the party moving for summary judgment, to produce evidence showing the absence of a genuine issue of material fact, may be discharged if the moving party can demonstrate that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986); *see also Lima Surgical Assocs.,* 20 Cl.Ct. at 679. If the moving party makes such a showing, the burden then shifts to the nonmoving party to demonstrate that a genuine factual dispute exists by presenting evidence which establishes the existence of an element of its case upon which it bears the burden of proof. *Celotex Corp. v. Catrett,* 477 U.S. at 322, 106 S.Ct. at 2552; *Lima Surgical Assocs.,* 20 Cl.Ct. at 679.

Pursuant to Rule 56, the motion for summary judgment may succeed, whether or not accompanied by affidavits and/or other documentary evidence in addition to the pleadings already on file. *Celotex Corp. v. Catrett,* 477 U.S. at 324, 106 S.Ct. at 2553. Generally, however, in order to prevail, the nonmoving party will need to go beyond the pleadings, by use of evidence such as affidavits, depositions, answers to interrogatories, and admissions, in order to demonstrate that a genuine issue for trial exists. *Id.*

In the above-captioned case, the fact that both the parties argue in favor of summary judgment and allege an absence of genuine issues of material fact, however, does not relieve the court of its responsibility to determine the appropriateness of summary disposition in the particular case. *Prineville Sawmill Co. v. United States,* 859 F.2d 905, 911 (Fed.Cir.1988) (citing *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1391 (Fed.Cir.1987)). "[S]imply because both parties moved for summary judgment, it does not follow that summary judgment should be granted one or the other." *LewRon Television, Inc. v. D.H. Overmyer Leasing Co.,* 401 F.2d 689, 692 (4th Cir.1968), *cert. denied,* 393 U.S. 1083, 89 S.Ct. 866, 21 L.Ed.2d 776 (1969); *see also Levine v. Fairleigh Dickinson Univ.,* 646 F.2d 825, 833 (3d Cir.1981); *Home Ins. Co. v. Aetna Casualty & Sur. Co.,* 528 F.2d 1388, 1390 (2d Cir.1976). Cross-motions are no more than a claim by each party that it alone is entitled to summary judgment. The making of such inherently contradictory claims, however, does not establish that if one is rejected the other is necessarily justified. *Rains v. Cascade Indus., Inc.,* 402 F.2d 241, 245 (3d Cir.1968); *Bataco Indus., Inc. v. United States,* 29 Fed.

Cl. 318, 322 (1993), *aff'd,* 31 F.3d 1176 (Fed. Cir.1994). The court must evaluate each party's motion on its own merit, taking care to draw all reasonable inferences against the party whose motion is under consideration. *Mingus Constructors, Inc.,* 812 F.2d at 1391.

In the above-captioned case, the court agrees with the parties that there are no genuine issues of material fact in dispute and that this case is ripe for summary disposition. As indicated above, the record indicates that the sale of the property at issue was accomplished by means of a Sales Contract, signed October 10, 1989, which includes a face page, on which the property, the sales price and the financing information are described, and the signatures of the parties to the contract appear. The reverse side of the Sales Contract contains the Conditions of Sale. Only two formal addendum documents to the Sales Contract were executed by the parties. The first, an Inspection Addendum, which was signed on October 6, 1989 by one party and by the other party on October 10, 1989, provides the buyers or their designees an opportunity to inspect the premises. The second addendum dealt with lead paint hazard protections. In addition, the parties agreed to two extensions of time regarding the deadlines included in the Inspection Addendum.

 The interpretation of a government contract is a matter of law, *Hol–Gar Mfg. Corp. v. United States,* 169 Ct.Cl. 384, 386, 351 F.2d 972, 973 (1965); *see also Restatement (Second) of Contracts* § 212(2) (1978), and the language of the "contract must be given that meaning that would be derived from the contract by a reasonable intelligent person acquainted with the contemporaneous circumstances." *Hol–Gar Mfg. Corp. v. United States,* 169 Ct.Cl. at 388, 351 F.2d at 975. Only when a contract is ambiguous will factors outside of the contract terms be taken into account. *See Sylvania Elec. Prods., Inc. v. United States,* 198 Ct.Cl. 106, 126, 458 F.2d 994, 1005 (1972). "When the terms of a contract are clear and unambiguous, there is no need to resort to extraneous circumstances, such as prior negotiations or custom of the trade for its interpretation." *Sea–Land Serv., Inc. v. United States,* 213 Ct.Cl.

555, 567, 553 F.2d 651, 658 (1977), *cert. denied,* 434 U.S. 1012, 98 S.Ct. 724, 54 L.Ed.2d 755 (1978); *Northwestern Indus. Piping, Inc. v. United States,* 199 Ct.Cl. 540, 550–51, 467 F.2d 1308, 1314 (1972); *Sylvania Elec. Prods., Inc. v. United States,* 198 Ct.Cl. at 126, 458 F.2d at 1005; *Perry & Wallis, Inc. v. United States,* 192 Ct.Cl. 310, 315, 427 F.2d 722, 725 (1970) (citing *Duhame v. United States,* 127 Ct.Cl. 679, 683, 119 F.Supp. 192, 195 (1954)); *Peterson–Sharpe Eng'g Corp. v. United States,* 6 Cl.Ct. 288, 295 (1984) (citing *David Nassif Assocs. v. United States,* 214 Ct.Cl. 407, 419–20, 557 F.2d 249, 256 (1977)).

In their complaint, plaintiffs allege that "[t]he Sales Contract through associated contract documents, including the Utility Agreement, represented that the property was serviced by a well located on the premises." They also allege that "[t]he property was not so serviced by the well, and as a result thereof, the defendants [sic] have breached the Sales Contract dated October 6, 1989 [sic—October 10, 1989] by failing to provide to the plaintiffs water as agreed to by the Defendant." Defendant, however, responds that: "The Kniepers rely entirely upon three documents to support their claims, the Utility Agreement, an Improvement Location Certificate, and the Deed to the property. Although the Kniepers allege a breach of the sales contract, none of these documents was part of the sales contract." Moreover, defendant points out that under the terms of the Sales Contract, through the Inspection Addendum, the plaintiffs agreed to accept the property "AS IS."

Line 12 of the Sales Contract specifically states: "This contract is subject to the Conditions of Sale on the reverse hereof, which is incorporated herein and made part of this contract." Immediately thereafter, the contract states: "Certification of Purchaser—the undersigned certifies that in affixing his/her/its signature to this contract he/she/it understands all the contents thereof (including the Conditions of Sale) and is in agreement therewith without protest." Both plaintiffs and a representative of the Secretary of HUD signed the Sales Contract immediately

below the Certification of Purchaser language.

In the Sales Contract, the Conditions of Sale, and the two addenda, which comprise the contract, only the Inspection Addendum, quoted in full above, even refers to water availability, and it does not make reference to a well on the property. The Inspection Addendum, consistent with its title, allowed inspection of the major operating systems, which are defined as the "structural, plumbing, electrical, heating and air conditioning (if any) systems and the roof." The Inspection Addendum, however, did not make any representations or warranties regarding these systems. To the contrary, the document states specifically: "No representation as to the condition of the property with respect to the major operating systems is made by HUD, its agents, sub-agents or employees unless such representation is disclosed to the Purchaser in writing." No such representation appears in the record.

■ Plaintiffs' allegations, however, seem to rely primarily upon three other documents to support their claims: a Utility Agreement, dated December 27, 1989; an Improvement Location Certificate, prepared for "HOMESTEAD FINANCIAL," dated December 15, 1989; and the Deed to the property, dated December 21, 1989, and recorded on January 4, 1990. Regarding the breach of contract claim, plaintiffs base their claim largely on the Utility Agreement signed on December 27, 1989. This document was executed by the parties at closing more than two and one-half months after the Sales Contract was signed on October 10, 1989. Paragraph L of the Conditions of Sale, which is part of the Sales Contract, however, states that "[t]he effective date of this contract is the date it is signed by the seller." Paragraph 0 of the Conditions of Sale also states that "[t]his contract contains the final and entire agreement between Purchaser and Seller and they shall not be bound by any terms, conditions, statements, or representations, oral or written, not contained in this contract."

Although plaintiffs rely on Colorado law, they point out, in their motion for summary judgment, that "the essential elements to a contract formation require that there be an offer proposed which, by its terms, is intended to become binding upon acceptance; and once there is an acceptance of such offer supported by valid consideration, the parties are bound." In the instant case, such acceptance occurred, and the contract was signed and finalized on October 10, 1989. Thus, the parties are bound to the contract as accepted on that date. Moreover, when the Utility Agreement was signed, it was not identified as an addendum to, or part of, the Sales Contract, and the Sales Contract makes no reference to the Utility Agreement. Consequently, the Utility Agreement should not be considered a part of the Sales Contract at issue in the above-captioned case.

Plaintiffs heavily rely upon the phrase "WELL AND SEPTIC" which is inserted in a blank space in the boilerplate language of the Utility Agreement. Plaintiffs argue that "[t]he Utility Agreement states that there is well and septic present, and clearly shows the representation and understanding of the parties as to this matter." A well is physically located on the property. Moreover, the Improvement Location Certificate, included in the record, identifies a well on the property, and also identifies a second well immediately adjacent to the property. Nowhere in the Utility Agreement, however, is there a reference to the condition of the well located on the property, or mention of any warranties that the well on the property was a working well. At the time the Sales Contract was signed and when the sale was closed, both parties were unaware that the well on the property did not supply water to the property, and that the off-site well was apparently the source of plaintiffs' water supply while they lived on the property. In addition, the Inspection Addendum specifically states that "[r]egardless of the outcome of the inspection, if the Purchaser does not cancel the contract as indicated above, the Purchaser accepts the property and its appurtenances in 'AS IS' condition." Plaintiffs chose neither to inspect the property nor to cancel the Sales Contract prior to closing on the property. Therefore, the court finds, pursuant to the Sales Contract signed by the parties, that the absence of a working well on the property transferred to the plaintiffs did

not constitute a breach of contract by the defendant.

Plaintiffs' third count alleges that "[t]he Defendant gave warranty through the Deed that the premises were conveyed with all appurtenances, which included water from the well located on the premises." Plaintiffs also state that "[t]he well did not service the premises, and the Defendant was [sic] breached the warranty by not providing to the Plaintiff[s] a well that serviced the property." Defendant responds, however, that "the United States never made any warranty concerning the presence of well water on the premises." Defendant asserts, and the court agrees, that the "warranties granted under the deed pertained to good title, not to physical condition of the property."

The interpretation of a deed, as an undisputed written instrument, is to be determined as a matter of law by the court. *Yaist v. United States,* 17 Cl.Ct. 246, 253 (1989). A general warranty deed only warrants good title, it does not warrant the condition of the property. *See, generally,* 14 Richard R. Powell & Patrick J. Rohan, *Powell on Property* ¶ 897 (1997). In their motion for summary judgment, plaintiffs conclude that a general warranty deed was transferred to them, although they try to broaden the impact of a general warranty deed. Plaintiffs state that a "General Warranty Deed was given to the Plaintiffs by the Defendant which contained warranties of title and a broad description of additional rights of property conveyed to the Defendant [sic—plaintiffs] therein."

With regard to any warranties conveyed by the Deed at issue in the instant case, the following language in the Deed is relevant:

And the said party of the first part [the Secretary of HUD], for himself and his successors, convenants [sic] and agrees to and with the said party(ies) of the second part [the Kniepers], their heirs and assigns, the above bargained premises in the quiet and peaceable possession of the said party(ies) of the second part [the Kniepers], their heirs and assigns, against all and every person or persons lawfully claiming or to claim the whole or any part thereof, by, through or under the said party of the first part [the Secretary of HUD], to **Warrant** and forever **Defend**.

The language of the Deed suggests that the Deed signed in the above-captioned case conveys the covenant of warranty ("warranty deed") and the covenant of quiet enjoyment. Neither covenant warrants the physical condition of the property. *See* 14 Richard R. Powell & Patrick J. Rohan, *Powell on Real Property* ¶ 897[1](b) (1997). Nor have plaintiffs claimed that there was a breach of any warranty relating to good title.

Plaintiffs also argue in their complaint that the term appurtenances in the Deed included "a well that serviced the property." The Deed states:

**Together** with all and singular the hereditaments and appurtenances thereunto belonging, or in any wise appertaining, ... either in law or equity, of, in and to the above bargained premises, with the hereditaments and appurtenances; **To Have and To Hold** the said premises above bargained and described with the appurtenances unto MARY L. Knieper AND KENNETH J. Knieper.

It is not disputed that the Deed transferred appurtenances, including a well on the property, to the plaintiffs. The dispute arises as to the condition of that well. The Deed is silent as to the condition of the well on the property, and no warranty as to the condition of the well, either express or implied, was included. The only warranty provided was made regarding the quality of the title, which is not at issue before the court.

Furthermore, the Deed explicitly states that plaintiffs took the property:

**Subject to All** covenants, restrictions, reservations, easements, conditions and rights appearing of record; and Subject to any state of facts an accurate survey would show.

The defendant could only transfer to the plaintiffs what the defendant had, and the defendant apparently possessed property on which was located an inoperative well. The court, therefore, finds that there was no breach of warranty by the defendant.

In the alternative to their breach of contract and breach of warranty theories, the plaintiffs seek to establish that the parties committed a mutual mistake of material fact, for which reason the plaintiffs seek to have the contract voided, and to recover the amounts they have expended, plus other damages incurred by the plaintiffs. Plaintiffs state that "both the Government and the Plaintiffs were unaware of the lack of water in the well," and that "[b]oth parties believed that the well shown on the Improvement Location Certificate provided water to the premises."

■■■ "A contract may be voidable, *i.e.*, a party may be entitled to rescission, when there has been a mutual mistake of fact or when the party seeking rescission was under a unilateral [6] mistake of fact." *Morris v. United States*, 33 Fed. Cl. 733, 747 (1995); *Roseburg Lumber Co. v. Madigan*, 978 F.2d 660, 665 (Fed.Cir.1992) (mutual mistake); *Meek v. United States*, 26 Cl.Ct. 1357 (1992), *aff'd*, 6 F.3d 788 (Fed.Cir.1993) (unilateral mistake, but in which the court cites to the *Restatement (Second) of Contracts* § 153 [7]). Courts, however, generally, "have been wary in granting relief from innocent mutual mistakes imbedded in, or underlying, consummated contracts." *National Presto Indus., Inc. v. United States*, 167 Ct.Cl. 749, 761, 338 F.2d 99 (1964), *cert. denied*, 380 U.S. 962, 85 S.Ct. 1105, 14 L.Ed.2d 153 (1965).

■■■ To establish a valid claim for mutual mistake, "plaintiffs must allege and prove that: '(i) the parties to the contract were mistaken in their belief regarding a fact; (ii) that the mistaken belief constituted a basic assumption underlying the contract; (iii) the mistake had a material effect on the bargain; and (iv) the contract did not put the risk of the mistake on the party seeking rescission.'" *Morris v. United States*, 33 Fed. Cl. at 747 (quoting *Dairyland Power Co–op. v. United States*, 16 F.3d 1197, 1202 (Fed.Cir.

1994)). Further, *Restatement (Second) of Contracts* § 152 states, in pertinent part:

> Where a mistake of both parties at the time a contract was made as to a basic assumption on which the contract was made has a material effect on the agreed exchange of performances, the contract is voidable by the adversely affected party unless he bears the risk of the mistake under the rule stated in § 154.

*Id.*

The plaintiffs allege that a mutual mistake was made at the time the contract was executed by the parties. The plaintiffs argue that the defendant "advertised the Property for sale on the basis that it contained well water." Plaintiffs, however, have not produced evidence to demonstrate that the existence of water in the well located on the premises was material to the bargain between the parties, or that it had a material effect on the bargain. In fact, in their filings, plaintiffs have included a photocopy of the advertisement for sale, published at the time the plaintiffs purchased the property, but the advertisement contains *no mention of a well*. The listing for the property in dispute states: "29554 Lee ... 80439 ... $81,-300 ... YES. 960 sf., 2bd., 1F1T ba, Ranch, LBP, frpl, 1 acre, 'New Look'." On the same photocopied page of advertisements included in the record, however, a number of the other listings do state "well & septic." Furthermore, the Improvement Location Certificate shows a well was located on the disputed property, and that well was conveyed as part of the property.

■■■ Finally, for rescission to be appropriate, the party seeking rescission must not bear the risk of the mistake under the contract. The *Restatement (Second) of Contracts*, § 154 provides that:

> A party bears the risk of a mistake when

---

**6.** Although the complaint appears to be filed under the theory of mutual mistake, in the plaintiffs' motion for summary judgment, the plaintiffs also address the theory of unilateral mistake.

**7.** The *Restatement (Second) of Contracts* § 153 (1978) covers unilateral contracts as follows:

> § 153. Where a mistake of one party at the time a contract was made as to a basic assumption on which he made the contract has a material effect on the agreed exchange of performances that is adverse to him, the contract is voidable by him if he does not bear the risk of the mistake under the rule stated in § 154,....

(a) the risk is allocated to him by agreement of the parties, or

(b) he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient, or

(c) the risk is allocated to him by the court on the ground that it is reasonable in the circumstances to do so.

*Id.* Comment a to *Restatement (Second) of Contracts* section 154, also points out that a party "bears the risk of many mistakes as to existing circumstances even though they upset basic assumptions and unexpectedly affect the agreed exchange of performances." *Restatement (Second) of Contracts* § 154, comment a.

The case law also states that, "[A] mutual mistake as to a fact or factor, even a material one, will not support relief if the contract puts the risk of such a mistake on the party asking reformation...." *Emerald Maintenance, Inc. v. United States,* 925 F.2d 1425, 1429 (Fed.Cir.1991) (quoting *Flippin Materials Co. v. United States,* 160 Ct.Cl. 357, 312 F.2d 408, 415 (1963)). *Restatement (Second) of Contracts,* comment b to section 154, states that "[t]he most obvious case of allocation of the risk of a mistake is one in which the parties themselves provide for it by their agreement...." *Restatement (Second) of Contracts* § 154, comment b.

■ Defendant argues that the warranty disclaimers in the Sales Contract and the Inspection Addendum "effectively shifted the risk of mistake to the Kniepers." Defendant refers to provisions in the Conditions of Sale which provide: "Purchaser will accept the property in the condition existing on the date of this contract," and "Seller does not warrant the condition of the property...." In the Inspection Addendum, defendant points to the following: "No representation as to the condition of the property with respect to the major operating systems is made by HUD ...;" the fact that the Inspection Addendum specifically allowed the purchaser the right of "inspection and approval ...;" and the words which state that "[r]egardless of the outcome of the inspection, if the Purchaser does not cancel the

contract as indicated above, the Purchaser accepts the property and its appurtenances in 'AS IS' condition."

The parties cite to *Morris v. United States,* 33 Fed. Cl. 733 (1995), which held that a party that bears the risk of mistake may not use the mistake, either mutual or unilateral, in order to void a contract. The *Morris* court found that an express "as is" provision "allocates the risk of any mistaken belief about the property to the purchaser," and that the party in *Morris* "contracted to buy the building 'as is,' not as he allegedly and subjectively believed it to be.... Thus, he bore the risk that his belief was not in accordance with the facts." *Id.* at 748 (emphasis added). Defendant also cites to *Pia v. United States,* 7 Cl.Ct. 208 (1985), *aff'd,* 818 F.2d 876 (Fed.Cir.1987), in which the property was offered for sale "as is." The *Pia* court pointed out that the bidders were advised to verify the nature of the title for themselves, that the plaintiff could have discovered the defect in question (an outstanding lien against the property), and that the "as is" disclaimer put the risk of the defect upon the purchaser. *Id.* at 211; *see American Sanitary Rag Co. v. United States,* 142 Ct.Cl. 293, 161 F.Supp. 414 (1958).

The court finds that the contract at issue in the above-captioned case expressly allocated the risk of loss to the plaintiffs, and, therefore, that the plaintiffs are not entitled to the relief they request. Given the totality of the circumstances, the court finds that plaintiffs bore the risk of their alleged mistake.

## CONCLUSION

After review of the record in the above-captioned case, this court finds that there are no genuine issues of material fact as to any of the three counts included in plaintiffs' complaint. On the undisputed facts, the court further finds that the defendant did not breach the Sales Contract and did not breach any warranties contained in the Deed. Moreover, this case does not qualify for rescission under the theory of mutual mistake of fact.

Therefore, the court **GRANTS** defendant's motion for summary judgment and **DENIES**

plaintiffs' cross-motion for summary judgment. The Clerk's Office is directed to enter judgment in favor of the defendant in accordance with this decision.

**IT IS SO ORDERED.**