## ARMED SERVICES BOARD OF CONTRACT APPEALS

Appeal of -- )
)
ECCI-C Metag, JV ) ASBCA No. 59031
)
Under Contract No. W5J9JE-10-D-0007 )

APPEARANCES FOR THE APPELLANT: Edward T. DeLisle, Esq.
Amy M. Kirby, Esq.
Cohen Seglias Pallas Greenhall &
Furman PC
Philadelphia, PA

APPEARANCES FOR THE GOVERNMENT: Thomas H. Gourlay, Jr., Esq.
Engineer Chief Trial Attorney
Daniel B. McConnell, Esq.
Geoffrey A. Mueller, Esq.
Edward J. McNaughton, Esq.
Matthew Tilghman, Esq.
Engineer Trial Attorneys
U.S. Army Engineer District, Middle East
Winchester, VA

## OPINION BY ADMINISTRATIVE JUDGE DICKINSON
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

This appeal arises under a task order for the design and construction of an Afghan National Police facility in Kunduz Province, Afghanistan. We have jurisdiction to adjudicate this appeal pursuant to the Contract Disputes Act (CDA), 41 U.S.C. §§ 7101-7109. The Commander of the United States Central Command (USCENTCOM)[1], determined that a subcontractor for appellant, ECCI-C Metag, JV (ECCI or appellant), was actively supporting an insurgency. Through another agency, appellant received notification of this determination by the USCENTCOM Commander (CDRUSCENTCOM)[2] and, after providing a copy of the notification to the contracting officer (CO) for the U.S. Army Corps of Engineers, Afghanistan District North (Corps or the government), appellant asked the CO how to proceed. The CO directed appellant to terminate the subcontract or else its own contract would

---

[1] Directorate for Joint Force Dev., Joint Chiefs of Staff, Joint Publ'n (JP) 1-02,
Dep't of Def. Dictionary of Military and Assoc'd Terms, at A-179 (2010).

[2] JP 1-02, at A-27.

be terminated for default. Appellant terminated the subcontractor as directed and submitted a claim for $3,252,818.92 and 61 days of delay resulting from the directed termination which, appellant contends, was a compensable change to the contract. Appellant now moves for summary judgment on the basis that nothing in the contract authorizes the CO to direct the contractor to terminate a subcontract. The government cross-moves, arguing that appellant was contractually required to terminate the subcontract, at its own expense, because the subcontractor's alleged conduct, i.e., supporting an insurgency, violated provisions of the contract requiring contractor and subcontractor personnel to comply with laws and regulations. We deny both parties' motions.

## STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTIONS

*A. The Contract*

1. On 8 March 2010, the Corps awarded Contract No. W5J9JE-10-D-0007 to appellant. The contract was a firm-fixed-price, multiple award task order contract (the MATOC) for "construction type work throughout Northern Afghanistan." (R4, tab 3)

2. The MATOC provided in full text the standard Disputes clause, FAR 52.233-1, DISPUTES (JUL 2002) (R4, tab 3 at 38-39). The MATOC also set forth in full text the standard Changes clause for fixed-price construction contracts, FAR 52.243-4, CHANGES (JUN 2007) (*id.* at 45-46); and a standard Default clause, FAR 52.249-10, DEFAULT (FIXED-PRICE CONSTRUCTION) (APR 1984) (*id.* at 49-50), which states, as relevant:

> (a) If the Contractor refuses or fails to prosecute the work or any separable part, with the diligence that will insure [sic] its completion within the time specified in this contract including any extension, or fails to complete the work within this time, the Government may, by written notice to the Contractor, terminate the right to proceed with the work (or the separable part of the work) that has been delayed....

> (b) The Contractor's right to proceed shall not be terminated nor the Contractor charged with damages under this clause if—

> (1) The delay in completing the work arises from unforeseeable causes beyond the control and without the fault or negligence of the Contractor. Examples of such causes include

2

(i) Acts of God or of the public enemy,

....

[(xi)] delays of subcontractors or suppliers at any tier arising from unforeseeable causes beyond the control and without the fault or negligence of both the Contractor and the subcontractors or suppliers; and

(2) The Contractor, within 10 days from the beginning of any delay (unless extended by the Contracting Officer), notifies the Contracting Officer in writing of the causes of the delay. The Contracting Officer shall ascertain the facts and the extent of delay. If, in the judgment of the Contracting Officer, the findings of fact warrant such action, the time for completing the work shall be extended....

....

(d) The rights and remedies of the government in this clause are in addition to any other rights and remedies provided by law or under this contract.

3. The MATOC incorporated by reference FAR 52.225-19, CONTRACTOR PERSONNEL IN A DESIGNATED OPERATIONAL AREA OR SUPPORTING A DIPLOMATIC OR CONSULAR MISSION OUTSIDE THE UNITED STATES (MAR 2008), which provides in pertinent part:

(a) *Definitions.* As used in this clause—

....

*Combatant commander* means the commander of a unified or specified combatant command established in accordance with 10 U.S.C. 161.

*Designated operational area* means a geographic area designated by the combatant commander or subordinate joint force commander for the conduct or support of specified military operations.

3

. . . .

(b) *General.* (1) This clause applies when Contractor[3] personnel are required to perform outside the United States—

(i) In a designated operational area during—

(A) Contingency operations;

(B) Humanitarian or peacekeeping operations; or

(C) Other military operations....

. . . .

(d) *Compliance with laws and regulations.* The Contractor shall comply with, and shall ensure that its personnel in the designated operational area...are familiar with and comply with, all applicable—

(1) United States, host country, and third country national laws;

(2) Treaties and international agreements;

(3) United States regulations, directives, instructions, policies, and procedures; and

---

[3] During notice-and-comment for FAR section 25.301 and FAR clause 52.225-19, it was requested that the clause define the term "contractor." In response, the FAR Council stated that "the FAR only applies to contracts as defined in FAR Part 2, not to the entire broad range of partners, ventures, and other types of contractors that may be used by the foreign assistance community." Federal Acquisition Regulation; FAR Case 2005-011, Contractor Personnel in a Designated Operational Area or Supporting a Diplomatic or Consular Mission, 73 Fed. Reg. 10,943, 10,949 (Feb. 28, 2008) (to be codified at FAR 25.301, 52.225-19); *but see* FAR 1.104, Applicability ("The FAR applies to all *acquisitions* as defined in Part 2 of the FAR, except where expressly excluded.") (emphasis added).

(4) Force protection, security, health, or safety orders, directives, and instructions issued by the...Combatant Commander; however, only the [CO] is authorized to modify the terms and conditions of the contract.

....

(h) *Contractor personnel.* The [CO] may direct the Contractor, at its own expense, to remove and replace any Contractor personnel who fail to comply with or violate applicable requirements of this contract. Such action may be taken at the Government's discretion without prejudice to its rights under any other provision of this contract, including termination for default or cause.

....

(p) *Changes.* In addition to the changes otherwise authorized by the Changes clause of this contract, the [CO] may, at any time, by written order identified as a change order, make changes in place of performance or Government-furnished facilities, equipment, material, services, or site. Any change order issued in accordance with this paragraph shall be subject to the provisions of the Changes clause of this contract.

(q) *Subcontracts.* The Contractor shall incorporate the substance of this clause, including this paragraph (q), in all subcontracts that require subcontractor personnel to perform outside the United States—

(1) In a designated operational area during—

(i) Contingency operations;

(ii) Humanitarian or peacekeeping operations; or

(iii) Other military operations....

(R4, tab 3 at 30)

5

4. The MATOC also provided in full text Joint Contracting Command Iraq/Afghanistan (JCC-I/A) clause 952.225-0004, COMPLIANCE WITH LAWS AND REGULATIONS (MAR 2009), which states:

(a) The Contractor shall comply with, and shall ensure that its employees and its subcontractors and their employees, at all tiers, are aware of and obey all U.S. and Host Nation laws, Federal or DoD regulations, and [USCENTCOM] orders and directives applicable to personnel in Iraq and Afghanistan, including but not limited to USCENTCOM, Multi-National Force and Multi-National Corps operations and fragmentary orders, instructions, policies and directives.

(b) Contractor employees shall particularly note all laws, regulations, policies, and orders restricting authority to carry firearms, rules for the use of force, and prohibiting sexual or aggravated assault. Contractor employees are subject to General Orders [sic] Number 1, as modified from time to time, including without limitation, their prohibition on privately owned firearms, alcohol, drugs, war souvenirs, pornography and photographing detainees, human casualties or military security measures.

(c) Contractor employees may be ordered removed from secure military installations or the theater of operations by order of the senior military commander of the battle space for acts that disrupt good order and discipline or violate applicable laws, regulations, orders, instructions, policies, or directives. Contractors shall immediately comply with any such order to remove its contractor employee.

(d) Contractor employees performing in the USCENTCOM Area of Operations (AOR) may be subject to the jurisdiction of overlapping criminal codes, including, but not limited to, the Military Extraterritorial Jurisdiction Act (18 U.S.C. Sec. 3261, et al) (MEJA), the Uniform Code of Military Justice (10 U.S.C. Sec. 801, et al) (UCMJ), and the laws of the Host Nation. Non-US citizens may also be subject to the laws of their home country while performing in the USCENTCOM AOR. Contractor employee status in these overlapping criminal jurisdictions may be modified from time to time by the

United States, the Host Nation, or by applicable status of forces agreements.

(e) Under MEJA, a person who engages in felony misconduct outside the United States while employed by or accompanying the Armed Forces is subject to arrest, removal and prosecution in United States federal courts. Under the UCMJ, a person serving with or accompanying the Armed Forces in the field during a declared war or contingency operation may be disciplined for a criminal offense, including by referral of charges to a General Court Martial. Contractor employees may be ordered into confinement or placed under conditions that restrict movement within the AOR or administratively attached to a military command pending resolution of a criminal investigation.

(f) Contractors shall immediately notify military law enforcement and the [CO] if they suspect an employee has committed an offense. Contractors shall take any and all reasonable and necessary measures to secure the presence of an employee suspected of a serious felony offense. Contractors shall not knowingly facilitate the departure of an employee suspected of a serious felony offense or violating the Rules for the Use of Force to depart Iraq or Afghanistan without approval from the senior U.S. commander in the country.

(R4, tab 3 at 263)

5. Additionally, the MATOC included several full-text clauses expressly applicable to both prime contractors and subcontractors, including: "LOCAL CLAUSES" 27.1, APPLICATION OF US CRIMINAL JURISDICTION ("[t]he contractor is directed to provide all of its personnel working under this contract, and to require all of its subcontractors to provide their personnel, with written notification that...contractor and subcontractor personnel...may be subject to US criminal jurisdiction") (R4, tab 3 at 181); JCC-I/A 952.222-0001, PROHIBITION AGAINST HUMAN TRAFFICKING, INHUMANE LIVING CONDITIONS, AND WITHHOLDING OF EMPLOYEE PASSPORTS (AUG 2009) ("all contractors ('contractors' refers to both prime contractors and all subcontractors at all tiers)") (*id.* at 257); JCC-I/A 952.225-0001, ARMING REQUIREMENTS AND PROCEDURES FOR PERSONAL SECURITY SERVICES CONTRACTORS AND FOR REQUESTS FOR PERSONAL PROTECTION (MAR 2009) ("[c]ontractor and its subcontractors at all tiers that require arming under this contract agree to obey all laws,

7

regulations, orders, and directives applicable to the use of private security personnel…[; c]ontractors will ensure that all employees, including employees at any tier of subcontracting relationships…comply with the contents of this clause") (*id.* at 258); JCC-I/A 952.225-0002, ARMED PERSONNEL INCIDENT REPORTS (MAR 2009) ("All contractors and subcontractors in the…theater of operations shall comply with and shall ensure that their personnel…are familiar with and comply with all applicable orders, directives, and instructions…relating to force protection and safety.") (*id.* at 261); and JCC-I/A 952.225-0009, MEDICAL SCREENING AND VACCINATION REQUIREMENTS FOR LOCALLY HIRED EMPLOYEES (MAR 2009) ("[c]ontractors, and subcontractors at any tier shall ensure and provide satisfactory evidence that all locally hired employees…do not currently have active tuberculosis…[; c]ontractor employees, including subcontractors at any tier, who work in positions where they are working with food or water production and distribution shall have current…vaccinations") (*id.* at 264).

## B. *The Task Order*

6. On 11 August 2010, the Corps awarded Task Order No. 0003 (the TO) to appellant for the design and construction of an Afghan National Police Uniformed Police Provincial Headquarters facility in Kunduz Province, Afghanistan (R4, tab 14).

7. The TO included the full text of DFARS 252.225-7040, CONTRACTOR PERSONNEL AUTHORIZED TO ACCOMPANY U.S. ARMED FORCES DEPLOYED OUTSIDE THE UNITED STATES (JUL 2009), which provides in pertinent part:

> (a) *Definitions.* As used in this clause—
> *Combatant Commander* means the commander of a unified or specified combatant command established in accordance with 10 U.S.C. 161.
>
> *Designated operational* area means a geographic area designated by the combatant commander or subordinate joint force commander for the conduct or support of specified military operations.
>
> ….
>
> (b) *General.*
>
> (1) This clause applies when Contractor personnel are authorized to accompany U.S. Armed Forces deployed outside the United States in—

(i) Contingency operations;

(ii) Humanitarian or peacekeeping operations; or

(iii) Other military operations or military exercises, when designated by the Combatant Commander.

. . . .

(d) *Compliance with laws and regulations.* (1) The Contractor shall comply with, and shall ensure that its personnel authorized to accompany U.S. Armed Forces deployed outside the United States as specified in paragraph (b)(1) of this clause are familiar with and comply with, all applicable—

(i) United States, host country, and third country national laws;

(ii) Provisions of the law of war, as well as any other applicable treaties and international agreements;

(iii) United States regulations, directives, instructions, policies, and procedures; and

(iv) Orders, directives, and instructions issued by the Combatant Commander, including those relating to force protection, security, health, safety, or relations and interaction with local nationals.

(2) The Contractor shall institute and implement an effective program to prevent violations of the law of war by its employees and subcontractors....

. . . .

(h) *Contractor personnel.* (1) The [CO] may direct the Contractor, at its own expense, to remove and replace any Contractor personnel who jeopardize or interfere with mission accomplishment or who fail to comply with or violate applicable requirements of this contract. Such action may be taken at the Government's discretion without prejudice to its rights under any other

9

provision of this contract, including the Termination for Default clause.

....

(p) *Changes*. In addition to the changes otherwise authorized by the Changes clause of this contract, the [CO] may, at any time, by written order identified as a change order, make changes in the place of performance or Government-furnished facilities, equipment, material, services, or site. Any change order issued in accordance with this paragraph (p) shall be subject to the provisions of the Changes clause of this contract.

(q) *Subcontracts*. The Contractor shall incorporate the substance of this clause, including this paragraph (q), in all subcontracts when subcontractor personnel are authorized to accompany U.S. Armed Forces deployed outside the United States in—

(1) Contingency operations;

(2) Humanitarian or peacekeeping operations; or

(3) Other military operations or military exercises, when designated by the Combatant Commander.

(R4, tab 14 at 7-13)

8. The TO also included, in full text, an unnumbered clause titled CONTRACTOR PERSONNEL IN THE UNITED STATES CENTRAL COMMAND AREA OF RESPONSIBILITY (DEVIATION 2007-O0010). A preamble paragraph preceding the clause stated:

The below DFARS DOD Class Deviation 2007-O0010 applies to Local National and Third Country nationals working on this contract. US Citizens are covered under DFARS Clause 252.225-7040 "Contractor Personnel Authorized to Accompany U.S. Armed Forces Deployed Outside the United States" in Section 00700.

(R4, tab 14 at 14) The "Other Nationals" clause, Class Deviation 2007-O0010, provides in pertinent part:

10

(a) *Definitions.* As used in this clause—

....

"Combatant commander" means the commander of a unified or specified combatant command established in accordance with 10 U.S.C. 161.

(b) *General.* (1) This clause applies when contractor personnel are required to perform in the United States Central Command (USCENTCOM) Area of Responsibility (AOR), and are not covered by the clause at DFARS 252.225-7040, Contractor Personnel Authorized to Accompany U.S. Armed Forces Deployed Outside the United States.

....

(c) *Support.* Unless specified elsewhere in the contract, the Contractor is responsible for all logistical and security support required for contractor personnel engaged in this contract.

(d) *Compliance with laws and regulations.* The Contractor shall comply with, and shall ensure that its personnel in the USCENTCOM AOR are familiar with and comply with, all applicable—

(1) United States, host country, and third country national laws;

(2) Treaties and international agreements;

(3) United States regulations, directives, instructions, policies, and procedures; and

(4) Force protection, security, health, or safety orders, directives, and instructions issued by the Combatant Commander; however, only the [CO] is authorized to modify the terms and conditions of the contract.

....

(h) *Contractor personnel.* The [CO] may direct the Contractor, at its own expense, to remove and replace any contractor personnel who fail to comply with or violate applicable requirements of this contract. Such action may be taken at the Government's discretion without prejudice to its rights under any other provision of this contract, including termination for default or cause.

....

(p) *Changes.* In addition to the changes otherwise authorized by the Changes clause of this contract, the [CO] may, at any time, by written order identified as a change order, make changes in place of performance or Government-furnished facilities, equipment, material, services, or site. Any change order issued in accordance with this paragraph shall be subject to the provisions of the Changes clause of this contract.

(q) *Subcontracts.* The Contractor shall incorporate the substance of this clause, including this paragraph (q), in all subcontracts that require subcontractor personnel to perform in the USCENTCOM AOR.

(R4, tab 14 at 14-18)

9. The TO included in full text an updated version of JCC-I/A 952.224-0004, COMPLIANCE WITH LAWS AND REGULATIONS (JAN 2010) (R4, tab 14 at 27-28), which was substantially identical to the March 2009 version included in the MATOC (*see* SOF ¶ 4, above).

10. Like the MATOC, the TO also included many clauses that applied expressly to both prime contractors and subcontractors. Some of these clauses, such as JCC-I/A 952.222-0001 (R4, tab 14 at 18), were identical to those set forth in full text in the MATOC. Others had been updated since the date of contract award, but not substantially so; these included JCC-I/A 952.225-0001, ARMING REQUIREMENTS AND PROCEDURES FOR PERSONAL SECURITY SERVICES CONTRACTORS AND FOR REQUESTS FOR PERSONAL PROTECTION (FEB 2010) (*id.* at 21-25); JCC-I/A 952.225-0002, ARMED PERSONNEL INCIDENT REPORTS (JAN 2010) (*id.* at 25-26); and JCC-I/A 952.225-0009, MEDICAL SCREENING AND VACCINATION REQUIREMENTS FOR LOCALLY HIRED EMPLOYEES (JAN 2010) (*id.* at 29-30) (*see* SOF ¶ 5, above).

12

11. Appellant subcontracted with Arvin Kam Construction Company (Arvin Kam) to perform some of the construction work required under the TO (app. mot. at 2; gov't resp. at 2).

*C. The National Defense Authorization Act for Fiscal Year 2012*

12. The National Defense Authorization Act for Fiscal Year 2012 (NDAA FY12) became law on 31 December 2011. NDAA FY12, Pub. L. No. 112-81, 125 Stat. 1298 (2011). The NDAA FY12 included, at § 841, a "Prohibition on Contracting with the Enemy in the [USCENTCOM] Theater of Operations." NDAA FY12 § 841, 125 Stat. at 1510-13.

13. Pursuant to § 841, the Secretary of Defense was required to establish a program to use available intelligence to review persons and entities receiving United States funds through contracts, grants, and cooperative agreements within the USCENTCOM theater of operations and identify those who were actively supporting an insurgency or were otherwise actively opposing United States or coalition forces in a contingency operation. NDAA FY12 § 841(c)(1), 125 Stat. at 1512. The CDRUSCENTCOM was responsible for the following notice requirements:

> (2) NOTICE TO CONTRACTING ACTIVITIES.—If the [CDRUSCENTCOM], acting pursuant to the program required by paragraph (1), identifies a person or entity as actively supporting an insurgency or otherwise actively opposing United States or coalition forces in a contingency operation, the Commander may notify the head of a contracting activity [(HCA)] in writing of such identification and request that the [HCA] exercise the authority provided in subsection (a) with regard to any contracts, grants, or cooperative agreements that provide funding directly or indirectly to the person or entity.

NDAA FY12 § 841(c), 125 Stat. at 1512.

14. Subsection (a) of § 841 authorized an HCA, upon receipt of the notification described at subsection (c) and pursuant to a request by the CDRUSCENTCOM, to take the following actions with respect to an existing contract:

> (B)…[T]erminate for default any Department contract, grant, or cooperative agreement upon a written determination by the [HCA] that the contractor, or the recipient of the grant or cooperative agreement, has failed to exercise due diligence to ensure that none of the funds

13

received under the contract, grant, or cooperative agreement are provided directly or indirectly to a person or entity who is actively supporting an insurgency or otherwise actively opposing United States or coalition forces in a contingency operation in the [USCENTCOM] theater of operations; or

(C)...[V]oid in whole or in part any Department contract, grant, or cooperative agreement upon a written determination by the [HCA] that the contract, grant, or cooperative agreement provides funding directly or indirectly to a person or entity that has been identified by the [CDRUSCENTCOM] as actively supporting an insurgency or otherwise actively opposing United States or coalition forces in a contingency operation in the [USCENTCOM] theater of operations.

NDAA FY12 § 841(a)(1), 125 Stat. at 1510-11. The authority provided under § 841(a) to restrict, terminate, or void contracts, grants, and cooperative agreements could not be delegated below the level of the HCA. NDAA FY12 § 841(d)(1), 125 Stat. at 1512.

15. Subsection (b) of § 841 required the Secretary of Defense to revise the DFARS to require new "covered contract[s]," awarded on or after the date of enactment, and, to the maximum extent practicable, the modification of existing "covered contract[s]," to include a new clause to implement § 841. NDAA FY12 § 841(b)(1), 125 Stat. at 1511. For purposes of the new § 841 clause, a "covered contract" was one "with an estimated value in excess of $100,000 that will be performed in the [USCENTCOM] theater of operations." NDAA FY12 § 841(b)(3), 125 Stat. at 1512. In crafting this new clause, Congress was motivated by concerns that existing remedy-granting clauses were too slow and unwieldy to prevent the continued flow of United States funds to insurgents:

The Department of Defense has informed the committee that time-consuming legal procedures could be required under current law before such contracts could be terminated. As a result, U.S. taxpayer money could continue to flow to persons supporting enemy forces for weeks or even months after the problem has been identified. On March 15, 2011, the Commander, United States Forces Afghanistan, testified that legislation addressing this issue would "be very helpful to us" and "the sooner the better."

14

The committee concludes that contracts with the enemy have the potential to seriously undermine U.S. national security objectives in the Central Command Theater of Operations and should be considered to be void as against public policy.

S. Rep. No. 112-26, at 145 (2011). Accordingly, the new clause required by § 841(b) would:

(A) require[] the contractor, or the recipient of the grant or cooperative agreement, to exercise due diligence to ensure that none of the funds received under the contract, grant, or cooperative agreement are provided directly or indirectly to a person or entity who is actively supporting an insurgency or otherwise actively opposing United States or coalition forces in a contingency operation; and

(B) notif[y] the contractor, or the recipient of the grant or cooperative agreement, of the authority of the [HCA] to terminate or void the contract, grant, or cooperative agreement, in whole or in part, as provided in subsection (a).

NDAA FY12 § 841(b)(2), 125 Stat. at 1511.

16. On 26 January 2012, the Director of Defense Procurement and Acquisition Policy issued Class Deviation 2012-O0005 implementing § 841 of the NDAA FY12. The class deviation required all "covered contracts" to be awarded on or before 31 December 2014 to include the new clause, DFARS 252.225-7993, PROHIBITION ON CONTRACTING WITH THE ENEMY IN THE [USCENTCOM] THEATER OF OPERATIONS (DEVIATION 2012-O0005) (JAN 2012). Additionally, existing "covered contracts" were required, "to the maximum extent practicable,...[to] be modified bilaterally, in accordance with FAR 1.108[4]," to include the new clause. OFFICE OF THE UNDER SECRETARY OF DEFENSE FOR ACQUISITION, TECHNOLOGY AND LOGISTICS, DARS TRACKING NO. 2012-O0005, CLASS DEVIATION—PROHIBITION ON CONTRACTING WITH THE ENEMY AND ACCESS TO CONTRACTOR AND SUBCONTRACTOR RECORDS IN THE [USCENTCOM] THEATER OF OPERATIONS (2012).

---

[4] "FAR conventions." FAR 1.108(d), "Application of FAR changes to solicitations and contracts," states in pertinent part: "(3) [COs] may, at their discretion, include the changes in any existing contract with appropriate consideration."

15

17. Neither the MATOC nor the TO was modified to include the new § 841 clause, DFARS 252.225-7993 (R4, tabs 3, 14).

*D. The § 841 Notification and the Termination of Arvin Kam*

18. On 24 July 2012, the CDRUSCENTCOM, Gen James N. Mattis, USMC, issued a notification pursuant to NDAA FY12 § 841 identifying appellant's subcontractor, Arvin Kam, as an entity that was actively supporting an insurgency. Gen Mattis' § 841 notification stated, in pertinent part:

> Pursuant to the [NDAA FY12, § 841], I have identified The Arvin Kam Group, LLC, The Arvin Kam Construction Company, Arvin Kam Group LLC Corporate Executives and Senior Partners to include:  Chairman/Chief Executive Officer, Vakil Saadat, Senior Executive and Partner, Haji Mohammad Almas Khan, and Senior Executive and Partners [sic], Haji Khalil Fruzi as actively supporting an insurgency and hereby request that the [HCA] exercise the authority provided in subsection (a) with regard to any contracts, grants, or cooperative agreements that provide funding directly or indirectly to the person or entity.

The § 841 notification was distributed to various HCAs.  (R4, tab 30)

19. On 9 August 2012, appellant received the § 841 notification regarding Arvin Kam from a different government agency with whom appellant was also contracting at the time.  By letter dated 12 August 2012, appellant notified the Corps that it had received the § 841 notification and provided the Corps with a list of projects and contract values that appellant had subcontracted to Arvin Kam.  Appellant concluded its 12 August 2012 letter with a request that the Corps "promptly inform us if we are to take action, such as termination of this subcontractor."  (R4, tab 36 at 13)

20. By letter dated 16 August 2012, CO Kerment Goss issued a cure notice to appellant.  CO Goss' cure notice stated the following, in pertinent part:

> Reference [ECCI] letter dated 12 August 2012 and CENTCOM Clause 252.225-0004 Compliance with Laws and Regulations included in the above-referenced contract. [ECCI] has employed Arvin Kam Group as a subcontractor under [Task Orders 0003, 0006, 0007, and 0009].  The U.S. Army Corps of Engineers, Transatlantic District-North (TAN) has determined [ECCI's] continued utilization of Arvin Kam Group on these task orders is a

16

violation of the above referenced clause, based on force protection reasons.

Therefore you are directed to terminate the services of Arvin Kam Group on these projects, effective immediately.

You are hereby required to terminate Arvin Kam Group within the next ten (10) days or I shall immediately initiate default proceedings in accordance with the terms of contract clause 52.249-10 Default – Fixed Price Construction.

(R4, tab 31)

21. By letter dated 18 August 2012, appellant acknowledged receipt of CO Goss' cure notice and advised the Corps that it had been instructed by the other government agency (see SOF ¶ 19, above) to provide it with a cost and schedule impact analysis prior to its deciding whether to direct appellant to terminate Arvin Kam. In order to afford the other agency adequate time to provide appellant with direction, thereby allowing appellant to act in a like manner with respect to all of its Arvin Kam subcontracts, appellant requested the Corps to allow it until 21 August 2012 to terminate Arvin Kam. Appellant informed the Corps that, "[i]n any event, ECCI considers this to be a Government-directed action by which ECCI will be owed both time and money due to the terminations," and asked whether the Corps required appellant's cost and schedule impact analysis by 21 August 2012. (R4, tab 32) The record does not include a response by the Corps.

22. By letter dated 30 August 2012, appellant informed the Corps that it had implemented the "Government-directed Termination of all services of Arvin Kam…based on [the Corps'] Cure Notice." Appellant noted that it had been "directed by the Government to take this termination action against Arvin Kam due to force protection reasons under the contract clause 952.225-0004-Compliance with Laws and Regulations (Jul 2010)." Appellant stated that it had reserved its rights to submit a new project schedule and a Request for Equitable Adjustment (REA) for costs associated with the directed termination of Arvin Kam; it expressed its disagreement that the CO could direct the termination of Arvin Kam under the purview of the contract's default termination clause; it stated that it understood the authority to direct the termination of Arvin Kam to flow from § 841 of the NDAA FY12; and it noted that neither the contract nor any task orders had been modified to include the § 841 clause, and even if they had been, the termination authority therein could not be delegated below the level of the HCA. (R4, tab 36 at 19-20) Appellant further stated that, because the government had knowledge of Arvin Kam's activities which

17

appellant did not have, appellant could not have been in default of any contract requirement, the use of a cure notice was unwarranted, and the government-directed termination of Arvin Kam thus constituted a compensable change to the contract and task order. Finally, appellant noted that Arvin Kam's subcontract had been terminated under a contract with another government agency (see SOF ¶¶ 19, 21, above), that the other agency had already requested appellant's cost and schedule impact, and that the other contract would be adjusted accordingly. (R4, tab 36 at 20)

*E. The REA, the Claim, the Final Decision, and the Appeal*

23. By letter dated 15 February 2013, appellant submitted a REA seeking an adjustment of $3,143,861.42 and 61 days of delay (R4, tab 36 at 3, 5). Appellant maintained: that the CO lacked the authority under the default termination clause to direct the termination of the subcontractor, Arvin Kam; that appellant had conducted due diligence by checking Arvin Kam's credentials under the excluded parties list system prior to awarding the subcontract, and thus the government had knowledge about Arvin Kam which appellant did not have; that appellant understood the CO's direction to terminate Arvin Kam to be an implementation of the statutory authority of NDAA FY12 § 841; that the contract had never been modified to include the § 841 clause; and that the government-directed termination of Arvin Kam's subcontract therefore constituted a compensable change (*id.* at 3-4).

24. By letter dated 24 October 2013, appellant converted its REA to a claim for $3,252,818.92 and 61 days of delay, the revised claim amount reflecting appellant's "actual costs incurred" (R4, tab 36 at 1). Appellant's 24 October 2013 claim was certified in accordance with 41 U.S.C. § 7103(b) (R4, tab 36 at 1433).

25. On 28 October 2013, CO Mary Beth McNair denied appellant's REA (R4, tab 37).

26. On 20 November 2013, CO Ralph La Rosa issued a final decision denying appellant's 24 October 2013 claim (R4, tab 2). In his final decision, CO La Rosa acknowledged that the reference to "CENTCOM Clause 252.225-0004 Compliance with Laws and Regulations" in CO Goss' 16 August 2012 cure notice (see SOF ¶ 20, above) was erroneous, and that the correct citation should have been "JCC-I/A Clause 952.225-0004 – Compliance with Laws and Regulations (Jan 2010)" (R4, tab 2 at 10). CO La Rosa also acknowledged that some of the task orders issued under the MATOC had "different designations of the clauses (Task Order 0003, for example, designated this clause as JCC-I/A Clause 952.225-0004, dated January 2010, while Task Order 0009 did not include the 'JCC-I/A' appellation, and the date was June 2010)," and that "this ha[d] given rise to some confusion in the correspondence" (*id.* at 10-11). Nevertheless, CO La Rosa concluded, "the fact that the title was correct

18

demonstrates that the correct Contract Clause was indicated, and ECCI was informed of the proper authority for the [directed] termination" (*id.* at 11).

27. On 22 November 2013, appellant filed its notice of appeal from the 20 November 2013 final decision.

DECISION

In moving for summary judgment, appellant contends that the issue before us is whether the Corps "used the authority in Section 841 of the [NDAA FY12] properly when [it] directed the termination of [appellant's] subcontractor, Arvin Kam" (app. mot. at 6). Appellant argues that no clause in either the MATOC or the TO granted to the CO the contractual right to direct appellant to terminate its subcontractor (*id.* at 8-10). According to appellant, the clause cited by the government as the authority for its direction to terminate the Arvin Kam subcontract, JCC-I/A 952.225-0004, only allows the removal of "Contractor employees" from military installations or the theater of operations by order of the senior military commander, not the removal of entire subcontractor entities (*id.* at 9). Appellant thus contends that the term "Contractor employee," as used in paragraph (c) of JCC-I/A 952.225-0004, does not include either "entire contractors" or subcontractors. Appellant further argues that if the government's interpretation of JCC-I/A 952.225-0004 was correct, then a CO would already have, without § 841, the authority to terminate a contract or subcontract for the sort of conduct that Congress sought to address with § 841, thereby rendering § 841 redundant even before it was enacted. (*Id.* at 10) Accordingly, appellant argues that the government's direction to terminate appellant's subcontractor was in fact an unauthorized exercise of the authority of the § 841 clause, DFARS 252.225-7993, which had not been incorporated into the MATOC or the TO through bilateral modification as required by § 841, and thus the government's conduct constitutes a compensable change (*id.* at 8, 10).

In its cross-motion for summary judgment, the government presents the issue as whether the CO's direction to terminate Arvin Kam was proper under the provisions of the TO (gov't mot. at 8). The government contends that it never used the authority of § 841 regarding the direction to terminate the Arvin Kam subcontract. The government argues instead that it properly exercised the authority of paragraphs (a) and (c) of JCC-I/A 952.225-0004, which required appellant, as the prime contractor, to ensure that its subcontractor Arvin Kam complied with the laws of Afghanistan. The government contends that "[t]here is also no question that engaging in support of an insurgency was treason, and contrary to the laws of Afghanistan." (*Id.* at 8-10) Accordingly, the government argues, upon learning that Arvin Kam was "violating the laws of Afghanistan," appellant had an obligation to terminate Arvin Kam in order to ensure that its subcontractors "obeyed all U.S. and Host Nation laws, Federal or DoD regulations, and [USCENTCOM] orders and directives," as required by

19

JCC-I/A 952.225-0004(a) (*id.* at 8-9). The government thus asserts that the term "contractor employee," as used in paragraph (c) of JCC-I/A 952.225-0004, necessarily includes subcontractors and subcontractor employees. The government further argues that the CO was authorized to direct the termination of the Arvin Kam subcontract pursuant to DFARS 252.225-7040 and the "Other Nationals" clause, Class Deviation 2007-O0010 (*id.* at 10-11), which allow the CO to direct a contractor, "at its own expense, to remove and replace any contractor personnel who fail to comply or violate applicable requirements of this contract" (DFARS 252.225-7040(h); "Other Nationals" clause, paragraph (h)).

It is well settled that summary judgment is appropriate only where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed. Cir. 1987). A material fact is one which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where, as here, the parties have filed cross-motions for summary judgment, we evaluate each motion on its own merits, taking care to draw all reasonable inferences against the party whose motion is under consideration. *Mingus*, 812 F.2d at 1391.

On an issue of contract interpretation, summary judgment may only be granted where there is no ambiguity in the contract terms at issue which would require us to weigh extrinsic evidence to resolve the matter. *Raytheon Co.*, ASBCA No. 58212, 15-1 BCA ¶ 35,999 at 175,865; *see also Aegis Defence Servs. Ltd.*, ASBCA No. 59082, 15-1 BCA ¶ 35,811 at 175,138-39 (the necessity of considering extrinsic evidence precludes summary judgment); *Beta Sys., Inc. v. United States*, 838 F.2d 1179, 1183 (Fed. Cir. 1988) ("[t]o the extent that the contract terms are ambiguous, requiring weighing of external evidence, the matter is not amenable to summary resolution"). An ambiguity exists when there are two or more different interpretations of the contract language at issue, each of which is consistent with the contract language and falls within a "zone of reasonableness." *See, e.g., Classic Site Solutions, Inc.*, ASBCA Nos. 58376, 58573, 14-1 BCA ¶ 35,647 at 174,551 ("ambiguity exists when there are two reasonable interpretations of the language under consideration"); *Santa Fe Engineers, Inc.*, ASBCA No. 25549, 82-2 BCA ¶ 15,982 at 79,253 (ambiguity exists only when language "is susceptible to two or more different and reasonable constructions, each of which is consistent with the contract language"); *Metric Constructors, Inc. v. NASA*, 169 F.3d 747, 751 (Fed. Cir. 1999) ("both [parties'] interpretations must fall within a zone of reasonableness"). Determining whether such differing interpretations are reasonable begins with an examination of the plain language of the contract, *James G. Davis Constr. Corp.*, ASBCA Nos. 58000, 58002, 15-1 BCA ¶ 35,818 at 175,154, construing the contract so as "to effectuate its spirit and purpose giving reasonable meaning to all parts of the contract," *Valley Apparel, LLC*, ASBCA No. 57606, 12-1 BCA ¶ 35,013 at 172,052 (quoting *Hercules, Inc. v. United States*, 292 F.3d 1378, 1381 (Fed. Cir. 2002)). In order to fall within the

20

"zone of reasonableness," a party's interpretation must be logically consistent with the contract and the parties' objectively ascertainable intentions. *See, e.g., NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1161 (Fed. Cir. 2004); *Bennett v. United States*, 371 F.2d 859, 861 (Ct. Cl. 1967). It must also "assure that no contract provision is made inconsistent, superfluous, or redundant," *Medlin Constr. Grp., Ltd. v. Harvey*, 449 F.3d 1195, 1200 (Fed. Cir. 2006) (quoting *Lockheed Martin IR Imaging Sys. v. West*, 108 F.3d 319, 322 (Fed. Cir. 1997)). If the contract language is susceptible to multiple reasonable interpretations, then we must resort to extrinsic evidence to derive a construction that effectuates the parties' intent at the time they executed the contract. *TEG-Paradigm Envtl., Inc. v. United States*, 465 F.3d 1329, 1338 (Fed. Cir. 2006); *see also Int'l Source & Supply, Inc.*, ASBCA Nos. 52318, 52446, 00-1 BCA ¶ 30,875 at 152,434 ("we do not interpret contractual terms in a vacuum; rather, our goal is to arrive at an interpretation that accurately reflects the intentions of the parties").

Based on the record before us, there appears to be no dispute that the clause to which the CO referred in the cure notice was JCC-I/A 952.225-0004, not DFARS 252.225-7040 or the "Other Nationals" clause.[5] After appellant provided the Corps with a copy of the § 841 notification for Arvin Kam (SOF ¶ 19), CO Goss promptly issued a cure notice directing appellant to terminate the subcontractor, referring to "CENTCOM Clause 252.225-004 Compliance with Laws and Regulations…based on force protection reasons" (SOF ¶ 20). Upon terminating the subcontractor, appellant acknowledged that it had been directed to do so "due to force protection reasons under the contract clause 952.225-0004-Compliance with Laws and Regulations (Jul 2010)" (SOF ¶ 21). Thus, there appears to be no question that the parties understood CO Goss' reference to "CENTCOM Clause 252.225-0004 Compliance with Laws and Regulations" to be a mistaken reference to JCC-I/A 952.225-0004, although we note that the requirement to comply with "force protection…orders, directives, and instructions" comes not from the JCC-I/A clause, but from DFARS 252.225-7040 and the "Other Nationals" clause.

---

[5] The FAR clause is in the MATOC (SOF ¶ 3), while the DFARS clause and the "Other Nationals" clause are in the TO (SOF ¶¶ 7, 8). It is not clear from the record which of these three clauses, which appear to be mutually-exclusive in their application, applies to appellant's subcontract with Arvin Kam under the TO. However, all three clauses are substantially identical with respect to their flow-down and "contractor personnel" provisions, and the parties do not contest the applicability of any particular clause, so it is not necessary to decide at this time which of the three clauses is applicable. Nonetheless, because the parties refer only to DFARS 252.225-7040 and the "Other Nationals" clause in their motions and pleadings, we shall confine our discussion to those two clauses.

Appellant asks us to infer from CO Goss' possession of the § 841 notification regarding Arvin Kam, (SOF ¶ 21), and the reference in the cure notice to "[ECCI] letter dated 12 August 2012," (SOF ¶ 20), that the CO was using § 841 authority to direct the termination of Arvin Kam. In the cure notice, however, CO Goss states that the government "has determined [ECCI's] continued utilization of [Arvin Kam] on these task orders is a violation of [the JCC-I/A clause]," and that either appellant shall "terminate [Arvin Kam] within the next ten (10) days or I shall immediately initiate default proceedings in accordance with the terms of contract clause 52.249-10 Default – Fixed Price Construction" (SOF ¶ 20). There is no mention whatsoever of § 841 in the cure notice (*id.*). To the extent that appellant argues that the CO improperly used the authority of § 841 when issuing the cure notice, the record does not support appellant's argument. Accordingly, we direct our inquiry to whether the CO properly used the authorities invoked in the cure notice.

It is well settled that the CO has the authority to direct the removal and replacement of a subcontractor, which generally entitles the contractor to an equitable adjustment based upon a change in the method or manner of performance. *See, e.g., Liles Constr. Co. v. United States*, 455 F.2d 527, 531-33 (Ct. Cl. 1972) (order to terminate and replace subcontractor was compensable change in the method and manner of performance); *Advanced Engineering & Planning Corp.*, ASBCA Nos. 53366, 54044, 05-1 BCA ¶ 32,806 at 162,320 (order to replace contractor employees with subcontractor employees was compensable change), *modified on other grounds*, 05-1 BCA ¶ 32,935. The question now before us is "whether [the CO] ha[s] the contractual *right* to do it without obligating the Government to compensate the contractor for any additional costs incurred." *Advanced Eng'g & Planning*, 05-1 BCA ¶ 32,806 at 162,320 (quoting *Liles Constr.*, 455 F.2d at 531). After all, it has been recognized that "[t]here is no greater interference with the manner and method of performance, short of termination of the work itself, than the ordered replacement of the craftsmen originally chosen to do the work." *Liles Constr.*, 455 F.2d at 532. If no clause expressly allows the CO to direct the removal and replacement of a subcontractor without compensation, such a direction is a compensable change. *Id.* at 533. We therefore must address whether the CO may direct the termination of a subcontractor pursuant to either JCC-I/A 952.225-0004 or the Default clause, FAR 52.249-10.

The parties dispute the applicability of JCC-I/A 952.225-0004 to "subcontractors and their employees." The term "contractor employee" is used throughout JCC-I/A 952.225-0004; however, paragraph (a) of the clause states that "[t]he Contractor…shall ensure that its employees and its subcontractors and their employees, at all tiers, are aware of and obey all [laws and regulations]" (SOF ¶¶ 4, 9). No other paragraph in the clause refers to "subcontractors and their employees" (*id.*). Because paragraph (a) refers to "contractor employees" and "subcontractor employees" as distinct entities, and subsequent paragraphs of the clause only refer to

22

"contractor employees," appellant would have us read all subsequent paragraphs in the clause as being applicable only to "contractor employees," exclusive of "subcontractors and their employees." The government disagrees, urging upon us a broader reading of "contractor employees" to include "subcontractor employees."

The term "contractor employee" is not expressly defined in any clause of the contract. However, reading the entire contract reveals the government's interpretation to be logically inconsistent. In contrast to JCC-I/A 952.225-0004, there are numerous other JCC-I/A clauses in the MATOC and the TO which, by their express terms, govern the conduct of contractor employees as well as subcontractor employees (SOF ¶¶ 5, 10). Additionally, DFARS 252.225-7040 and the "Other Nationals" clause contain mandatory subcontracts flow-down provisions at paragraph (q), "Subcontracts" (SOF ¶¶ 7, 8).[6] All of these clauses demonstrate that the government knows how to draft a clause that applies with equal effect to both contractors and subcontractors either directly or pursuant to flow-down provisions in subcontracts. However, when the government updated JCC-I/A 952.225-0004 in January 2010 – the version of the clause set forth in full text in the TO – it did not include language to make the JCC-I/A clause correspond to DFARS 252.225-7040 and the "Other Nationals" clause (SOF ¶ 9). We believe this objectively indicates an intention for the term "contractor employees" in JCC-I/A 952.225-0004 to mean exactly what it says – "contractor employees," not "subcontractor employees."

The government argues that appellant's interpretation would deprive it of its remedy under the clause, i.e., ordering the removal of disruptive or disobedient personnel, with respect to subcontractor personnel (gov't mot. at 11). This, too, is inconsistent with the language of the contract. Unlike DFARS 252.225-7040 and the "Other Nationals" clause, JCC-I/A 952.225-0004 does not authorize a CO to direct the contractor to "remove and replace any…personnel who…fail to comply with or violate applicable requirements of [the] contract" (SOF ¶¶ 4, 7, 8). Rather, paragraph (c) of JCC-I/A 952.225-0004 states: "*Contractor* employees may be ordered removed from secure military installations or the theater of operations by order of the *senior military commander of the battle space*" (SOF ¶ 4) (emphasis added). The government's interpretation is thus inconsistent with both the contract and the government's objectively ascertained intent, and therefore it falls outside the zone of reasonableness.

The government's argument that the CO was justified in directing the termination of the subcontractor under JCC-I/A 952.225-0004 because such authority exists pursuant to DFARS 252.225-7040 and the "Other Nationals" clause, (gov't mot.

---

[6] Both clauses, at paragraph (h), "Contractor personnel," allow the CO to direct the removal and replacement of "any Contractor personnel" who fail to comply with or violate applicable requirements of the contract.

at 10-11), is likewise unavailing. Those clauses both state, at paragraph (h), that the CO may direct the removal and replacement of "contractor personnel" (SOF ¶¶ 7, 8). As with JCC-I/A 952.225-0004, the term "contractor personnel" in those clauses cannot reasonably be interpreted to include "subcontractor personnel." Such an interpretation would render the subcontract flow-down provisions at paragraph (q) of those clauses superfluous or redundant. *See Medlin*, 449 F.3d at 1200. Nor has the government shown that DFARS 252.225-7040 or the "Other Nationals" clause were flowed-down to the Arvin Kam subcontract. Accordingly, we conclude that the only reasonable interpretation of the term "contractor employees" as it is used in JCC-I/A 952.225-0004 is that it does not include "subcontractor employees," and that JCC-I/A 952.225-0004 does not expressly allow the CO to direct the removal and replacement of a subcontractor.

If our inquiry was limited to the question of whether "contractor employees" includes "subcontractor employees" for purposes of the JCC-I/A clause, that would be the end of the matter and in favor of appellant's position. However, while the JCC-I/A clause does not expressly allow for the removal and replacement of a subcontractor, the CO may nevertheless be entitled under certain circumstances to direct the removal and replacement of a subcontractor pursuant to the Default clause, FAR 52.249-10.

Pursuant to paragraph (a) of JCC-I/A 952.225-0004, a contractor must "ensure that its...subcontractors and their employees, at all tiers, are aware of and obey all [applicable laws, regulations, orders, instructions, policies, or directives]" (SOF ¶ 4). A contractor's failure to ensure that its subcontractors or their employees did not engage in such conduct would be a breach of the requirements of paragraph (a) of the clause. If such a breach amounted to a material breach of the contract, the CO would be justified in terminating ECCI's contract under the Default clause. *See, e.g., All-State Constr., Inc.*, ASBCA No. 50586, 06-2 BCA ¶ 33,344 at 165,341-42 (failure to proceed as required by FAR 52.233-1(i) is a material breach justifying termination under the government's common law rights reserved in paragraph (d) of the Default clause); *M.C.&D. Capital Corp.*, ASBCA No. 38181 *et al.*, 91-1 BCA ¶ 23,563 at 118,130-31, *aff'd*, 948 F.2d 1251 (Fed. Cir. 1991) (unapproved variation or deviation from requirements of a construction contract justified default termination). A breach is material if it relates to a matter of vital importance, or goes to the essence of the contract. *Tzell Airtrak Travel Group Corp.*, ASBCA No. 57313, 11-2 BCA ¶ 34,845 at 171,410; *see also* 23 SAMUEL WILLISTON & RICHARD A. LORD, A TREATISE ON THE LAW OF CONTRACTS § 63:3 (4th ed. 1993) (breach is material if a party fails to perform a substantial part of the contract or one or more of its essential terms or conditions; the breach substantially defeats the contract's purpose; or the breach is such that upon a reasonable interpretation of the contract, the parties considered the breach as vital to the existence of the contract). The parties have not briefed the issue of whether a violation of the requirements of paragraph (a) of JCC-I/A 952.225-0004 would amount to a material breach of the contract, and we are not required to answer

24

that question in order to reach a decision on the parties' current motions. Accordingly, we do not.

Even if a violation of paragraph (a) of JCC-I/A 952.225-0004 amounted to a material breach of the contract, however, a termination for default "is a drastic sanction...which should be imposed (or sustained) only for good grounds and on solid evidence," *J.D. Hedin Constr. Co. v. United States*, 408 F.2d 424, 431 (Ct. Cl. 1969), and the government has the burden of proving that a termination is justified, *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 765 (Fed. Cir. 1987). We cannot agree with the government's bald contention that supporting an insurgency – much less the cursory allegation of supporting an insurgency that appeared in the § 841 notification – was unquestionably conduct amounting to "treason...contrary to the laws of Afghanistan" (gov't mot. at 8). We are unfamiliar with the law of Afghanistan on this matter, and although we are empowered under Board Rule 6(c) to "consider any relevant material or source, including testimony, whether or not submitted by a party" in determining foreign law, we are not obligated to do so. *Weigel Hochdrucktechnik GmbH & Co. KG*, ASBCA No. 57207, 12-1 BCA ¶ 34,975 at 171,924. Where, as here, the government asks us to consider the law of a foreign country, the government bears the burden of producing appropriate evidence of the foreign law and demonstrating its application to the matters before us. *Lael Al Sahab & Co.*, ASBCA No. 58346, 14-1 BCA ¶ 35,738 at 174,917. We conclude that the government has not adequately demonstrated that the CO was aware of conduct specifically in violation of paragraph (a) of JCC-I/A 952.225-0004 prior to issuing the cure notice.

The record before us requires additional development, and there are also important issues that have not yet been addressed by the parties. Without knowing what evidence the CO had at the time of issuing the cure notice of subcontractor conduct that would constitute a failure to abide by the terms of paragraph (a) of JCC-I/A 952.225-0004, and without knowing whether a failure by ECCI to ensure its subcontractor's compliance with the JCC-I/A clause would amount to a material breach of the contract, we cannot say whether or not the government was justified under the Default clause in directing appellant to terminate its subcontractor. Accordingly, there are material facts in dispute precluding summary judgment.

## CONCLUSION

On the basis of the foregoing, appellant's motion for summary judgment and the government's motion for summary judgment are denied.

Dated:  22 October 2015

DIANA S. DICKINSON
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 59031, Appeal of ECCI-C Metag, JV, rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

26